IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 28222-8-III |
| Respondent and | ) | (consolidated with |
| Cross Appellant, | ) | No. 30001-3-III) |
| | ) | |
| v. | ) | |
| | ) | |
| SALVADOR S. NAVA, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |
| In the Matter of the Personal Restraint | ) | |
| Petition of: | ) | OPINION PUBLISHED |
| | ) | IN PART |
| SALVADOR NAVA, | ) | |
| | ) | |
| Petitioner. | ) | |

SIDDOWAY, A.C.J. — In order for a witness's unsworn tape-recorded statement to

police to be admitted as a recorded recollection, the proponent of the evidence must

establish among other factors that the record accurately reflects the witness's prior

knowledge. *State v. Alvarado*, 89 Wn. App. 543, 551, 949 P.2d 831 (1998) held that this

fourth factor of the foundation may be satisfied without the witness's direct averment of

accuracy at trial. In this case, because Salvador Nava fled the country following the

murder of Antone Masovero in May 2001 and was not apprehended and tried for the

murder until eight years later, the State's case was based in part on the admission, as recorded recollections, of statements of four witnesses tape-recorded by Yakima police detectives in 2001. Three of the recorded statements were admitted even though at trial the witnesses disavowed, to some degree, the accuracy of their 2001 statements.

We hold that the trial court did not abuse its discretion in finding that the foundation for admitting the evidence was satisfied even in the face of the witness's disavowals, where the disavowals were equivocal or not credible, and were countered by other evidence—best assessed by the trial court—suggesting that the recorded statements had been accurate. Mr. Nava was allowed to present evidence and argument to the jury challenging their weight and credibility.

In the unpublished portion of the opinion, we reject Mr. Nava's challenge to the admission of gang evidence, his claim of ineffective assistance of counsel, and issues raised by a statement of additional grounds and a personal restraint petition (PRP) consolidated with his appeal. We agree with the State's cross appeal that the trial court's exceptional sentence downward cannot stand. We affirm the convictions, reverse the sentence and remand for resentencing, and dismiss Mr. Nava's PRP.

FACTS AND PROCEDURAL BACKGROUND

Shortly after midnight one night in May 2001, Antone Masovero was shot and killed as he sat as a passenger in a sedan that Anthony Martinez had just pulled up to a

2

taco truck in a supermarket parking lot. Although over a dozen people were in the vicinity of the taco truck at the time of the shooting, most scattered before police arrived.

Police Officer Mark Lewis was performing traffic patrol nearby when he heard gunshots and saw muzzle flashes coming from the direction of the lot. He radioed in a report and was driving toward the lot when Mr. Martinez drove the gold Nissan Altima sedan in which Mr. Masovero sat, fatally wounded, out of the lot, its lights off, traveling toward the officer in the wrong lane of traffic. As Mr. Martinez approached the officer, he turned to his left into what appeared to be a street but was instead a curbed back entrance to a fire station. A gate across the station entrance stopped him and Officer Lewis pulled in and blocked him from the rear. Officer Lewis and other responding officers detained Mr. Martinez, his front seat passenger, and two passengers who had been sitting in the back with Mr. Masovero. Mr. Masovero had been shot twice through the head and was slumped in the left rear passenger seat, his head and shoulders covered in blood. It was apparent to officers that he was dead.

Officers were immediately dispatched to identify any witnesses in the parking lot or nearby homes, but only Guadalupe Rojas and her husband Angel Rojas, who had arranged with their children to meet in the parking lot following a nearby quinceañera,[1] were able to provide helpful information. Mr. and Ms. Rojas traveled to the police

---

[1] A quinceañera is a coming of age party celebrating a 15th birthday.

station and provided statements to then-Detective (later Sergeant) Joe Salinas.[2] Mr. Rojas described a man he had seen walk up to the sedan in which Mr. Masovero was sitting and fire the fatal shots; from his description, detectives prepared a photomontage that they presented to Mr. Rojas the next morning. Although he was not able to make a firm identification, Mr. Rojas did tap his finger on the picture of Salvador Nava, the fourth picture in the array, as "look[ing] like" the shooter. Report of Proceedings (RP) (Jan. 29, 2009) at 78.

The four surviving passengers from the Martinez sedan were also questioned by police within hours following the shooting, but none provided information that was helpful in establishing who committed the assault. Only two survivors in the sedan would later be called as trial witnesses by the State; both claimed that Mr. Masovero was shot within less than a minute after they arrived at the taco truck. Both denied that there had been any altercation between anyone in their car and persons in the lot before the shooting began. Both claimed to have ducked down and covered their heads as soon as shots were fired and did not see who did the shooting.

Police found a .25 caliber semiautomatic pistol approximately 10 to 15 feet from where Mr. Martinez's vehicle was detained by Officer Lewis. It turned out the vehicle

---

[2] By the time of trial, Joe Salinas was a police sergeant and was generally addressed as such in the trial record. At the time of the Masovero murder and his assignment to lead the investigation into the murder, he served as a detective, however, and in recounting facts from that time frame, we refer to him as Detective Salinas.

was stopped very near the home of a cousin of Mr. Nava. The gun was found by a firearm examiner to be inoperable. The police also found unspent cartridges of .45 and .380 caliber ammunition in the lot but no spent shell casings. They found dented but unopened beer cans as they walked the streets adjacent to the parking lot.

Mr. Martinez's sedan was impounded and when later examined, revealed three bullet holes or impact marks in or near the rear driver's side door and the right rear headrest. Based on the examination of the car and the results of an autopsy, Sergeant Salinas concluded and later testified that two shots struck Mr. Masovero and as many as three additional shots were fired at the car.

Officers investigating the crime believed that Mr. Masovero's murder was related to the murder of Victor Serrano, which had occurred 10 days earlier. Mr. Serrano was associated with a Sureño gang active in Yakima and went by the tag name Smurf. That murder took place at or very near Antone Masovero's home and Sergeant Salinas, who worked on both homicides, recalled that Mr. Masovero allegedly handed the gun used to murder Mr. Serrano to the shooter.

The afternoon following the murder, then-Detective Salinas attended the autopsy of Mr. Masovero. There, he was able to see the clothing that Mr. Masovero was wearing at the time he was shot. It included a red belt with the number 14 on it. Sergeant Salinas would later testify that the Norteño gang claims an allegiance or an affiliation to the color red as well as the number 14, the fourteenth letter of the alphabet being "N." Two bullets

were retrieved from Mr. Masovero's head during the autopsy. They proved to be hollow point bullets that would have been fired from a .38 special caliber or .357 magnum caliber revolver.

Three days after the shooting, officers executed a search warrant for the home of Cesar and Marisa Perez and invited Detective Salinas to assist. The basis for the search was drug related but officers anticipated that it might yield evidence connected with the Masovero murder. The Perezes were friends of Mr. Nava and, it turned out, had been present in the parking lot at the time of the shooting.

Only Ms. Perez and a baby were present at the Perez home when officers arrived to execute the warrant. During the search, officers found and seized weapons, a small amount of drugs, and an article about the Masovero murder that had been cut out of the newspaper. One of the officers commented that they should arrest Ms. Perez and take her to the station. Detective Salinas responded—later admitting that he was playing "the good cop"—that he thought Ms. Perez wanted to talk. RP (Feb. 3, 2009) at 458. Ms. Perez, who had by that time heard that people had accused her husband of the Masovero murder, started crying and, according to Detective Salinas, "blurted out, what if I tell you who did the shooting." *Id.* They took her to the police station where she provided a tape-recorded statement.

Ms. Perez told officers that a number of her and her husband's friends were present in the parking lot the night of the shooting, having arranged to meet there

6

following a quinceañera in Selah. She and her husband arrived in their car, accompanied by her husband's sister Sandra Perez and their friend Crystal. Chava (the name by which she knew Mr. Nava, a friend of her husband's) had arrived in a different car with a man she knew as Panic (later identified as Andres Orozco), Lance Nanamkin, and two women she did not know.

According to Ms. Perez, her group and Mr. Nava's group had been at the taco truck for about 20 minutes when the gold sedan in which Mr. Masovero was a passenger arrived, at which point an altercation immediately began between the driver of the sedan and Mr. Nava, Mr. Orozco, and Mr. Nanamkin. She told the officers that in the course of the argument and yelling, Mr. Nava retrieved a gun from the car in which he had been riding, walked back to the sedan, and shot the passenger in the driver's side of the back seat, who she believed had a gun. She said that Mr. Nanamkin also had a gun and had tried to shoot but his gun jammed. She said that Mr. Orozco had thrown a full beer can at the sedan but that he overshot the sedan and the can landed in the street.

In answering the officers' questions, she implicitly accepted their characterization of the men in the gold sedan as Norteños, a rival gang of the Sureños. She, too, referred to the men as Norteños. She told the officers that as he was shooting, Mr. Nava yelled, "[T]hat was for my homie Smurf." *Id.* at 480. She was aware that someone named Smurf had been killed two weeks earlier. She said that in the several days after the shooting her husband had talked to Mr. Nava, who knew the police were looking for him

7

and was scared that "the cops might—they'll find him and if the cops don't find him, the Norteños will." *Id.* at 476.

In the course of her interview, Ms. Perez identified pictures of Mr. Nava, Mr. Nanamkin, and Mr. Orozco. Detective Salinas used the photos to prepare and post a notice that the three men were wanted for questioning in connection with the murder. Mr. Nanamkin was located shortly thereafter and officers obtained a search warrant for the Nanamkin home.

When officers served the warrant at Mr. Nanamkin's home, his mother was present and showed them her son's room. Officers found and seized paraphernalia marked "VSL," which Sergeant Salinas later testified stands for a local Sureño gang, Varrio Sureños Lokota. Police photographs of the room captured Mr. Nanamkin's moniker "Sleepy," which was displayed on the doorframe. Sergeant Salinas would later testify that "[w]hat stood out most" was a large photo of Victor Serrano—Smurf—"[p]osted prominently in his room on one of the walls." RP (Feb. 4, 2009) at 613-14.

The next witness to provide helpful information was Maribelle Olivas. Ms. Olivas was one of the two women, unknown to Ms. Perez, with whom Mr. Nava was riding on the night of the shooting. Ms. Olivas owned the white Honda Accord that the group was traveling in that evening. After Mr. Masovero's murder, she heard rumors that because she owned the car in which Mr. Nava was riding threats were being made against her, not necessarily by the men in the gold sedan, but "just the guys that have the color red." RP

8

(Feb. 2, 2009) at 344. She was on probation at the time for drug charges and expressed concern about her safety to her probation officer, who notified Detective Salinas.

Detective Salinas met with Ms. Olivas five days after the shooting. She initially denied knowing anything about the shooting, but then relented and agreed to provide a tape-recorded statement. She told the detective that the group in her car had arrived at the taco truck between a quarter and a half hour before the gold sedan belonging to Anthony Martinez arrived. She knew Mr. Martinez and recognized his car. Earlier in the evening, Ms. Olivas had let her friend Alicia Velasquez drive her car, but on arriving at the taco truck, Ms. Olivas moved into the driver's seat, fearing that something bad was going to happen. She attributed her worry to the gang activity that had been going on, saying "everybody was out for revenge. It's basically that there was a war going on between them. . . . The blues and the reds." *Id.* at 336. She told the detective that she believed the men that were with her and Ms. Velasquez "belonged to the blue." *Id.*

Ms. Olivas said that as Mr. Martinez's car approached the taco truck the driver began "exchanging words back and forth" with the men standing by the truck. *Id.* at 337. With that, she put her car in reverse, pulled out from where she was parked, and prepared to leave. She saw the driver of Mr. Martinez's car step out and it appeared to her that he was reaching for a gun; she could see that Mr. Nava had a gun in his hand, which he pointed at the Martinez car. It appeared that Mr. Nanamkin had a gun as well. At that point, Ms. Velasquez joined Ms. Olivas in the Honda as did Mr. Orozco, and Ms. Olivas

9

drove off. In departing, she heard shots that sounded as if they came from one gun. She assumed it was Mr. Nava's since he had been pointing a gun and prepared to shoot when she last looked at him.

According to Ms. Olivas, Ms. Velasquez, who considered Mr. Nava her boyfriend, "jumped off" shortly after getting into the car. *Id.* at 340. Ms. Olivas continued on with Mr. Orozco, dropping him off at his home before proceeding to the home of one of her cousins.

Mr. Orozco was questioned by Detectives Michael Tovar and David Cortez approximately a month after the shooting. Mr. Orozco did not come in voluntarily but was picked up for questioning about the Serrano and Masovero murders.

When interviewed, Mr. Orozco told police he was with friends, including Mr. Nava, Crystal and Sleepy, the name by which he referred to Mr. Nanamkin, on the night Mr. Masovero was shot. He told the detectives that they left a quinceañera in Selah and went to the taco stand in the supermarket parking lot where he got out of the car and a man started "talking shit" to him. RP (Jan. 29, 2009) at 155. Mr. Orozco confronted the man, who he claimed ran away. Two other cars then came their way and, according to Mr. Orozco, the occupants of the cars started "throwing signs." *Id.* at 157. Mr. Orozco then saw Mr. Nava fire a revolver three or four times.

Mr. Orozco was not sure where Sleepy was during the altercation but he did not see anyone other than Mr. Nava with a weapon. He also did not hear anyone say

10

anything. After the shots were fired, he got in the car with Ms. Olivas who was frightened and tearful, and the two took off. Ms. Olivas dropped him at his home.

Mr. Nanamkin was eventually charged and pleaded guilty to manslaughter. Efforts to locate Mr. Nava proved unsuccessful. A warrant for his arrest issued, however, and in July 2008 he was apprehended in El Paso, Texas. When questioned by Detective Arturo Ruiz of the El Paso Police Department, Mr. Nava originally denied having lived in Washington but eventually admitted that he had been at the scene of the Masovero shooting in May 2001. He denied having a gun or being the shooter. He was returned to Yakima to stand trial on one count of first degree murder, four counts of first degree assault, and one count of second degree unlawful possession of a firearm. The murder and assault charges alleged that he was armed with a firearm.

Before trial, the State and the defense notified the court that several witnesses were expected to claim a lack of recollection and the State might offer tape-recorded statements they had given to detectives in 2001 as recorded recollections under ER 803(a)(5). Mr. Nava filed a motion in limine, asking the trial court to exclude the statements based principally on his inability to conduct meaningful cross-examination of witnesses claiming an insufficient recollection.

As anticipated, four witnesses who had provided tape-recorded statements shortly after the murder and were called as witnesses at trial proved to have an insufficient recollection to testify fully and accurately. The first was Mr. Orozco. The procedure

11

followed by the trial court with Mr. Orozco and later witnesses was for the State to first call the witness; for the lawyers to examine and cross-examine the witness to the extent possible about the night of the shooting; and, when the witness's ability to testify to relevant matters was exhausted, to excuse the jury. Outside the presence of the jury, the State presented evidence bearing on the remaining elements of the required foundation, including playing the proffered tape-recorded statement. The trial court then heard argument from the lawyers; ruled on the admissibility of the recording; and, if it found the recording admissible, allowed the State to play the recording for the jury after which the witness would be subject to further examination and cross-examination.

Mr. Orozco was the first witness whose tape-recorded statement was offered by the State as a recorded recollection. With the jury present, he testified when asked if at one time he had a memory of what took place the night of Mr. Masovero's murder, "Not really, I was drunk." RP (Jan. 29, 2009) at 85. He later expanded, saying, "I was drunk drunk. I can't remember nothing." *Id.* at 86. He explained that he had been drinking "[b]eer, tequila, whatever, doing drugs." *Id.* Asked if he had a memory of events on the day he provided a recorded statement to police, he testified, "They picked me up early in the morning. I was drunk, I don't know." *Id.* at 93. He testified that he "used to do a lot of crack and crank, cocaine, every day." *Id.*

Asked if he was lying to police in providing the recorded statement, Mr. Orozco testified:

12

A     I probably was. I'm a liar.
Q     Okay.
A     I lie to my wife, I lie to everybody.
Q     Why would you have lied to the police at that time?
A     I wanted to go home, man, they scare me. I just wanted to go home. I just told them what they wanted to hear, whatever, you know. I just wanted to go home, that's it.

*Id.* at 93-94. Mr. Orozco reiterated a couple more times that he probably lied to police before the State asked the trial court if it could take up an issue outside the presence of the jury.

With the jury absent, the State called David Cortez, formerly a detective and by the time of trial a police officer, who had sat in on the tape-recorded interview of Mr. Orozco in June 2001. Asked if Mr. Orozco had been under the influence of any intoxicant or controlled substance at the time he gave the statement, the officer responded, "No, not that I recall," and then testified that Mr. Orozco had not been difficult to interview, that the interview went smoothly, that "[t]here wasn't any time where Mr. Orozco didn't quite understand what he was being asked, didn't have any or give any indication that he was tired, that he was under the influence or that he couldn't remember something." *Id.* at 119-20. He testified that Mr. Orozco was able to describe events chronologically, spoke coherently and logically, did not change his story, and that information provided by Mr. Orozco in June 2001 was consistent with physical evidence recovered at the scene. He testified that Mr. Orozco's recollection appeared to be fresh in his mind and that he never expressed any fear of retaliation or concerns for his safety.

13

With the jury still absent, Mr. Orozco was recalled and his 14-minute tape-recorded statement was played for the court. The lawyers were allowed to examine him further and Mr. Orozco admitted that it was his voice on the recording.

After hearing argument of counsel, the trial court ruled that it would admit the recorded recollection. It found all four elements of the required foundation had been established, explaining, with respect to former knowledge and accuracy, that it found that Mr. Orozco was presently "being evasive. He just doesn't want to cooperate in any regard with regard to this," adding, "I'm going to find that this is his statement that was in fact made to the police on June 17th at a time when it was fresh in his memory and that we're going to let the jury decide what they want to do with it." *Id.* at 150.

The next witness whose recorded statement was offered as evidence by the State was Peter Lopez, the passenger sitting next to the right rear window of Mr. Martinez's sedan when Mr. Masovero was shot. The same procedure was followed. Mr. Lopez testified that he assumed his statement was accurate and that he valued honesty. The admission of his statement (in which he testified that he never saw the shooter) is not challenged.

The third recorded statement offered was that of Maribelle Olivas. Ms. Olivas testified that in 2001 she was abusing alcohol and drugs, and was in treatment. She claimed to be unable to remember whether she told officers the truth. Outside the presence of the jury, her recorded statement was played with Ms. Olivas on the stand.

14

When asked following the playing of her statement if there was any reason that the statement that had been played was not accurate and truthful, she answered:

> At that time I was in treatment, I was (inaudible) and I could not get in any trouble whatsoever at all and I did not want them to find out about this. Even though we did find out about it, so they knew and at that time I still was drinking and I was not supposed to be drinking so I didn't want them to find out anything about what I was doing on the weekends.

RP (Feb. 2, 2009) at 360. Asked again if she had any reason for believing the statement she gave was not accurate, she answered:

> I don't think it was very accurate. I could tell by the recording that I was hung over and I could tell that I probably just told him what he wanted to hear just so I didn't have to continue talking to him.

*Id.*

The trial court also heard testimony from Sergeant Salinas outside the presence of the jury, addressing facts bearing on the reliability of the procedure for taking Ms. Olivas's statement, his observations bearing on Ms. Olivas's truthfulness, and the consistency of her statement with other evidence. Having heard the testimony and the arguments of the lawyers, the trial court again found the recording admissible, observing, as to accuracy, "[S]he says, I was hung over. Now, that affects whether or not she has— she's telling us now that it may affect her ability to have all the events clearly laid out. Whether or not she told the police officer what he wanted to hear, that doesn't send me a clear signal that she's disavowing the statement." *Id.* at 363.

15

Thereafter, when the recording was played to the jury and the parties completed their questioning of Ms. Olivas, defense counsel asked if she did not just tell the officer what he wanted to hear. This time, Ms. Olivas answered:

> Pretty much toward the beginning, you know, *I—really I was pretty honest about what we did, you know, going out and stuff,* but I think toward the end I think I just wanted to get out of there.

*Id.* at 384 (emphasis added). Outside the presence of the jury, the court observed that "[s]ometimes it's necessary to hear what people say a couple of times in order to get a real feeling for what they're really saying," and that her answer before the jury suggested that she was not disavowing accuracy, "she just wanted to get out of there. And she was going to cut to the chase on everything and just give an abbreviated version of it or some version that wasn't as thorough and complete. She just wanted to get out of there." *Id.* at 385.

The last witness whose recorded statement was offered by the State was Marisa Perez. When asked with the jury present if the events of the night of the shooting were fresh in her memory in May 2001, she answered, "No, because when they caught me I was under pressure and I was really scared and I got the impression like if I was being arrested." RP (Feb. 3, 2009) at 427. When asked why she felt she was under pressure, she answered:

> Because a different incident had happened and they were questioning—all these questions telling me my husband was going to jail and that they were

16

going to take my baby away and I don't—just throwing a bunch of questions at me.

*Id.* She testified that her memory of the events "was never fresh." *Id.* at 428.

Outside the presence of the jury, her recorded statement was played. When asked by the prosecutor after listening to the recording whether it now sounded like the matter was fresh in her memory when she gave the statement, she answered, "Sounds like I was scared and I wanted to protect my husband." *Id.* at 451. Yet when defense counsel then asked whether she was lying to the officer, she answered, "I might have said some stuff that were misinterpreted or . . . *I don't feel like I was lying.* I don't remember what I said, how could it be if I was lying." *Id.* at 452 (emphasis added).

Sergeant Salinas testified outside the presence of the jury that he had not prompted Ms. Perez in answering his questions and that she provided details in her statement that were consistent with statements from other witnesses and with physical evidence in the parking lot. He also testified that after she provided the recorded statement she called her husband Cesar, and he heard her tell Cesar to "come on in and tell them the truth because I already have," after which Mr. Perez came in and provided a similar statement.[3] *Id.* at 456.

---

[3] Mr. Perez was in California at the time of trial. Although the State instituted proceedings in California to compel his appearance, there was difficulty in getting him on the intended flight to Spokane. The State ultimately decided to rest its case without calling him.

Having heard the tape-recorded statement and the testimony of Ms. Perez and Sergeant Salinas, the trial court again found that the State had demonstrated the necessary foundation and admitted the recorded statement. The court commented that it recognized that Ms. Perez, like other witnesses, had conflicted feelings "as to what happened, as to their loyalties [and] as to their own jeopardy" that would perhaps affect their recall as to certain events and may "shade their testimony a little bit," but it had not heard her disavow the accuracy of her statement made in May 2001. *Id.* at 460. It reiterated that the defense had the right to question the witnesses as to their motivations and argue to the jury how much credibility or weight should attach to their statements, but that they were nonetheless admissible.

The jury found Mr. Nava guilty on all counts. In sentencing Mr. Nava, the court imposed a total sentence of 520 months, which it originally believed could be arrived at by sentencing him within the standard range and running the assault and firearm counts concurrently, but consecutive to the murder count.

When the lawyers presented a proposed judgment and sentence the following week, however, they reported to the court that a total sentence of 520 months could be achieved only by imposing a sentence for the first count (first degree premeditated murder) of 220 months—less than the low end of the standard range for his offender score—and running that sentence concurrent with the remaining counts. That is what the court did, then, in order to preserve what it said it continued to believe was the

18

appropriate total sentence. Its only finding was a marginal notation next to the 220-month base sentence for count one that "[t]he court finds that the multiple offense policy permits the court to go below the standard range under RCW 9.94A.535.[4]" Clerk's Papers (CP) at 8.

Mr. Nava appealed his convictions and the State cross appealed the exceptional downward sentence. Mr. Nava also filed a PRP that has been consolidated with this appeal.

## ANALYSIS

Mr. Nava presents three assignments of error on appeal:[5] First, that the trial court erred in admitting the tape-recorded statements of Mr. Orozco, Ms. Olivas, and Ms. Perez; second, that the court erred in admitting gang evidence; and third, that he was denied effective assistance of counsel where his lawyer failed to request a limiting

---

[4] Since the May 13, 2001 crime date, the pertinent sections of the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, have been recodified or renumbered. As do the parties, we cite to the current statutes because the language of the provisions has remained substantively unchanged.

[5] Mr. Nava's opening brief identified five, but he has abandoned two. He conceded in his reply that his assignment of error to the trial court's failure to give a limiting instruction on the jury's use of the gang evidence fails in light of the Washington Supreme Court's intervening decision in *State v. Russell*, 171 Wn.2d 118, 123-24, 249 P.3d 604 (2011). Reply Br. of Appellant at 30. His assignment of error to prosecutorial misconduct, for the prosecutor's citation of evidence that was not a part of the record, was decisively countered by the State's response, which relied upon a correction to the record. Following that correction of the record Mr. Nava implicitly abandoned the prosecutorial misconduct charge in his reply and in oral argument.

19

instruction addressing the gang evidence. The State cross appeals, assigning error to the sentence imposed by the trial court. We discuss Mr. Nava's first assignment of error in the published portion of this opinion and the remaining issues on appeal, cross appeal, and the consolidated PRP in the unpublished portion.

## Admission of Recorded Recollections

Mr. Nava first assigns error to the trial court's admission of the tape-recorded statements given to Yakima detectives in 2001 by Mr. Orozco, Ms. Olivas, and Ms. Perez.[6] Decisions involving evidentiary issues lie largely within the sound discretion of the trial court and ordinarily will not be reversed on appeal absent a showing of abuse of discretion. *State v. Castellanos*, 132 Wn.2d 94, 97, 935 P.2d 1353 (1997). A trial court abuses its discretion if it improperly applies an evidence rule. *State v. Young*, 160 Wn.2d

---

[6] After Mr. Nava filed his opening brief the trial court entered findings of fact and conclusions of law supporting its rulings to admit the recorded statements under ER 803(a)(5) and gang evidence subject to ER 404(b). Mr. Nava argued in his reply that the findings and conclusions were tailored and that the State improperly failed to give notice to appellate counsel that it was presenting them. The State responded by obtaining leave to supplement the appellate record with correspondence from the trial court from which it appears that preparation of the findings and conclusions was very much a court-driven process. We do not view the trial court's findings as reflecting any change in its oral rulings that would require leave from this court under RAP 7.2. On the other hand, and while no procedural rule requires that the State give a defendant's appellate counsel notice of proceedings in the trial court, the failure to provide appellate counsel with notice of presentment as a courtesy is viewed with disfavor by our court. *State v. Corbin*, 79 Wn. App. 446, 451, 903 P.2d 999 (1995); *State v. Cunningham*, 116 Wn. App. 219, 227, 65 P.3d 325 (2003). We choose to disregard the court's findings and conclusions. The trial record is adequate for appeal.

20

799, 806, 161 P.3d 967 (2007). Here, Mr. Nava's challenge focuses on the trial court's determination of a preliminary question concerning the admissibility of evidence.

The proponent of evidence must establish the elements of a required foundation by a preponderance of the evidence. *State v. Benn*, 120 Wn.2d 631, 653, 845 P.2d 289 (1993) (citing *State v. Tharp*, 96 Wn.2d 591, 594, 637 P.2d 961 (1981)). The trial court generally determines preliminary questions concerning the admissibility of evidence and in doing so is not bound by the rules of evidence except those with respect to privileges. ER 104(a). On appeal, we will uphold the trial court if its determination of the preliminary questions is supported by substantial evidence. *Benn*, 120 Wn.2d at 653.

A recorded statement given to police is inadmissible hearsay unless it qualifies for an exception to the hearsay rule. The exception for "recorded recollections" is one such exception. A record qualifies as a recorded recollection if it is

> [a] memorandum or record concerning a matter about which a witness once
> had knowledge but now has insufficient recollection to enable the witness
> to testify fully and accurately, shown to have been made or adopted by the
> witness when the matter was fresh in the witness' memory and to reflect
> that knowledge correctly.

ER 803(a)(5). A recorded recollection is admitted as substantive evidence.

Courts evaluating a record or memorandum for admission under ER 803(a)(5) have gleaned four elements of a foundation from the rule. Admission is proper when the proponent of the evidence demonstrates that (1) the record pertains to a matter about which the witness once had knowledge, (2) the witness has an insufficient recollection of

21

the matter to provide truthful and accurate trial testimony, (3) the record was made or adopted by the witness when the matter was fresh in the witness's memory, and (4) the record reflects the witness's prior knowledge accurately. *State v. Mathes*, 47 Wn. App. 863, 867-68, 737 P.2d 700 (1987).

In *Alvarado*, Division One of our court adopted the view of the Sixth Circuit Court of Appeals and several other courts that the fourth element of the foundation—that the record reflects the witness's prior knowledge accurately—may be satisfied without the witness's direct averment of accuracy at trial. 89 Wn. App. at 551 (citing *State v. Marcy*, 165 Vt. 89, 680 A.2d 76, 80 (1996) and *United States v. Porter*, 986 F.2d 1014, 1017 (6th Cir. 1993), whose reasoning was adopted by *Marcy*). Instead, to determine whether the record reflects the witness's prior knowledge accurately, *Alvarado* announced that "[t]he court must examine the totality of the circumstances, including (1) whether the witness disavows accuracy; (2) whether the witness averred accuracy at the time of making the statement; (3) whether the recording process is reliable; and (4) whether other indicia of reliability establish the trustworthiness of the statement." *Id.* at 551-52.

In *Alvarado*, the witness in question had provided three statements to police. In his second statement he stated he lied in the first because he feared the defendants, but in his third statement he asserted that the information recounted in the second and third statements was true. At trial he testified that he did not recall the incident at all and could not verify if any of his statements were true or not. *Id.* at 547. The trial court admitted

22

the second and third statements as reliable but it excluded the first statement that the witness had admitted in later statements was untrue.

This case requires us to decide the relative importance of a declarant's trial testimony disavowing or calling into doubt the accuracy of his or her recorded recollection. *Alvarado* and later Washington decisions have usually involved witnesses who did not disavow the report or memorandum being offered as a recorded recollection. *Id.* at 552 (witness never recanted or disavowed the accuracy of the statements admitted by the court); *State v. Derouin*, 116 Wn. App. 38, 46, 64 P.3d 35 (2003) (same); *State v. White*, 152 Wn. App. 173, 185, 215 P.3d 251 (2009) (declarant claimed to have been "'too intoxicated'" to know if the statement initialed by her was accurate but did not disavow it).

No reported Washington decision has yet held that if a witness disavows accuracy, other circumstances supporting the correctness of the record can outweigh the disavowal. In *State v. Floreck*, 111 Wn. App. 135, 139, 43 P.3d 1264 (2002), the court distinguished *Alvarado* where a witness, whose statement it concluded should not have been admitted, testified that her earlier statement was a lie—but this was after the court had already concluded that ER 803(a)(5) was not a basis for admission anyway, since the declarant had a sufficient recollection to testify. And in *Alvarado*, the trial court excluded the one statement—the first—that the witness at one time claimed was a lie. In *Derouin*, however, the witness mildly disavowed the accuracy of her signed statement when she

23

refused to rule out inaccuracy, testifying that she had signed mortgage papers in the past without knowing what she was signing. Noting that "[t]he only facts going against admission are from [the witness's] testimony," the court stated in *Derouin*, "Her testimony alone, under *Alvarado*, is not enough to support suppression of the statement when there are sufficient indicia of the statement['s] accuracy to admit it." 116 Wn. App. at 47. No reported Washington decision has presented the disavowal of a witness that is as forceful as those presented here—at least none as forceful as Mr. Orozco's.

*Alvarado* discussed the view of two recognized commentators on Washington evidence law that the witness should normally vouch that a statement correctly reflects his or her former knowledge. 89 Wn. App. at 550 (quoting ROBERT H. ARONSON, THE LAW OF EVIDENCE IN WASHINGTON 803-35.0 (2d ed. 1994); 5B KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 368, at 187 (3d ed. 1989)). Following *Alvarado*, neither commentator has appeared to share the appellate court's confidence that evidence of accuracy other than the witness's own vouching can suffice. Professor Tegland still speaks of the "bright-line traditional requirement" that the witness testify to the probable accuracy of the statement that *Alvarado* abandoned "for better or for worse." 5C KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 803.29, at 86 (5th ed. 2007); *and see id.* at 85 n.1 (citing 2 *McCormick on Evidence* § 283 (John William Strong ed., 4th ed. 1992) and 4 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 443 (2d ed. 1994) as support for the traditional

24

requirement). Professor Aronson writes that "[i]t is questionable whether the Court of Appeals' expansion of the historic requirement that the witness testify that the prior statement was accurate when made comports with Washington hearsay jurisprudence." ROBERT H. ARONSON, THE LAW OF EVIDENCE IN WASHINGTON § 803.04[6], at 803-51 (4th ed. 2012).[7] Other commentators have been even more critical of the broad view, characterizing the Sixth Circuit's decision in *Porter*, on which *Alvarado* relied, as "arguably incorrect." 30C MICHAEL H. GRAHAM, FEDERAL PRACTICE AND PROCEDURE § 7046 n.4 (2011 Interim ed.).

We nonetheless find the reasoning of *Alvarado*, *Porter*, and like cases persuasive, even when it means that a trial court might admit a record that a witness has disavowed. Most important is that the language of ER 803(a)(5) providing the basis for the fourth element of the foundation—its requirement that the memorandum or record "reflect [the witness's former] knowledge correctly"—provides no textual basis for requiring that the witness personally vouch for the accuracy of the recorded statement. The well settled statement of the fourth element of the foundation—"that the record reflects the witness's prior knowledge accurately"—does not require personal vouching by the witness either. The Advisory Committee's Note accompanying Fed. R. Evid. 803(a)(5) when proposed

---

[7] Professor Aronson also questions whether *Alvarado* comports with *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), but the defendant's right of confrontation was not raised in *Alvarado* nor does Mr. Nava raise it here.

25

in 1972 states, in part, that "[n]o attempt is made in the exception [for recorded recollections] to spell out the method of establishing the initial knowledge or the contemporaneity and accuracy of the record, leaving them to be dealt with as the circumstances of the particular case might indicate." 56 F.R.D. 183, 307 (1973). ER 803(a)(5) was copied verbatim from Fed. R. Evid. 803(a)(5). *See* ER 803(a)(5) at 91 Wn.2d 1165 (1978); cmt. 803 at 91 Wn.2d 1168.

In no other context is a fact finder expected to determine what a person knew or believed by relying exclusively on what that person *claims* he or she knew or believed. This is so even in applying other exceptions to the hearsay rule that depend on the reliability we ascribe to certain types of out-of-court statements. For example, we do not automatically accept a recanting witness's protestation that what appeared to others to be her excited utterance was actually a fabrication. In *Young*, a child victim made seemingly distraught statements after being sexually molested by her mother's boyfriend, only to claim later that she was lying. Our Supreme Court held that "'the trial court does not err by weighing the witness's credibility against the evidence indicating that the statements were spontaneous and reliable.'" 160 Wn.2d at 808 (quoting *State v. Briscoeray*, 95 Wn. App. 167, 173, 974 P.2d 912 (1999)). The same should be true here. As observed in *Derouin*, 116 Wn. App. at 46, "[O]ther evidence establishing the accuracy of [a recorded recollection] could be just as credible as, if not more so, than the declarant's testimony at trial that the statement was accurate when made."

26

Needless to say, a witness's disavowal of a record of his or her prior knowledge is highly important evidence in determining whether the record is accurate and we view our holding as creating a narrow opening, at most, for admitting a recorded recollection that a witness disavows. To overcome the witness's disavowal there must be not only other reliable evidence that the record accurately reflects the witness's prior knowledge but also an articulable reason, supported by the record, why the trial court disbelieves the witness's current disavowal.

It will be the rare case in which a proponent of a recorded recollection will be able to satisfy both these requirements if the witness's disavowal is resolute, as Mr. Orozco's, in particular, was here. In such a case, the court must find the disavowal to be essentially perjurious in addition to finding sufficient independent evidence of reliability.

It is hard to imagine a civil case that will require the court to make a ruling on admissibility like the ones required in *Alvarado*, *Porter*, and here. It is unlikely that a witness who once created a record of her firsthand knowledge and who cannot remember enough to testify about the matters she recorded will, at the same time, claim to know that her record is unreliable. It is even more unlikely that the party offering the recorded recollection will be able to present the court with other credible evidence that the record *does* accurately reflect the witness's prior knowledge, despite her disavowal. Unless a witness is just being especially cautious (insisting, for instance, that "I can't be positive") we foresee a recorded recollection being admitted over the witness's disavowal

27

predominantly in criminal cases involving reluctant witnesses, such as prosecutions of domestic and gang violence.

*Derouin* was a domestic violence case and in deciding it, Division One of this court observed that broadly viewing evidence bearing on the accuracy of a statement "is especially relevant in cases of domestic violence since the victim may have a stronger motive to forget the past statement than to remember it." *Derouin*, 116 Wn. App. at 46; *accord White*, 152 Wn. App. at 184-85. Prosecutions for acts of gang-related violence may also depend upon information provided by witnesses who, at trial, have a stronger motive to forget a past statement than to remember it.

Along these lines, one treatise has recognized that courts may apply the foundation requirements for recorded recollection somewhat differently in the case of what it calls "recalcitrant" or "stubborn" witnesses, "usually aris[ing] when a prosecutor seeks to elicit incriminating testimony from the defendant's friend, coconspirator, spouse or relative." 5 CLIFFORD S. FISHMAN, JONES ON EVIDENCE § 32:34, at 83 (7th ed. 2003). In the case of such witnesses, it provides examples of some courts that hold to the traditional bright-line foundation but others that have demonstrated a willingness to relax the requirement that the witness explicitly acknowledge that the statement was accurate when made. Discussing *Porter*, the treatise states that the Sixth Circuit may have "broken new ground in application of the rule—or perhaps has merely made explicit what other courts have permitted without acknowledging it." *Id.* at 89.

28

Here, the State presented credible evidence that the tape-recorded statements accurately reflected Mr. Orozco's, Ms. Olivas's, and Ms. Perez's prior knowledge and the trial court provided reasons, supported by the record, why it either did not believe the witness's current disavowal or did not regard it as a disavowal.

The recorded recollections were tape-recorded interviews of the witnesses, most of which were audible and clear, with the witnesses answering questions in their own words. Each of the recorded statements was acknowledged by the witness, at trial, to be a record of his or her questioning by detectives. Each witness audibly vouched for the truth of his or her statement when it was recorded in 2001 and also agreed at that time, audibly, that no force was used or threat or promise made to induce him or her to provide the statement. The statements of Ms. Perez and Ms. Olivas were recorded within a matter of days of the murder of Mr. Masovero and the statement of Mr. Orozco was recorded within approximately a month thereafter.

Each witness provided details that were largely consistent with each other and with the physical evidence. Mr. Nava disputes this, but what he characterizes as inconsistencies and contradictions are either facts addressed with some witnesses but not with others; inconsistencies that are minor or admit of a ready explanation;[8] or a global

---

[8] For example, one inconsistency relied upon by Mr. Nava is between Mr. Orozco's statement that he alone left the parking lot with Ms. Olivas, while Ms. Olivas's statement was that Ms. Velasquez was in the car as well. Yet Ms. Olivas also testified that when she "drove off from the scene," the people in the car were "[j]ust me and

29

dispute between the passengers of the Olivas and Perez cars on the one hand, and the Martinez car on the other, over whether the shooting was preceded by yelling and argument or was entirely unprovoked.

Unlike us, the trial court was able to observe each witness's demeanor at trial and compare that to the witness's demeanor in the tape-recorded interviews.

The court provided reasons, supported by the record, for disbelieving or discounting the witness's disavowals. It found that Mr. Orozco was simply choosing to be uncooperative at trial. There is sufficient evidence in the transcript to support this and insofar as it was based on the court's assessment of Mr. Orozco's credibility, we defer to the trial court; we do not weigh the credibility of witnesses. *In re Welfare of Sego*, 82 Wn.2d 736, 739-40, 513 P.2d 831 (1973).

The court concluded that Mr. Orozco's and Ms. Olivas's testimony as to their drinking and drug use during the 2001 time frame went to the weight of their statements, not their admissibility, a conclusion supported by other decisions. *See White*, 152 Wn. App. at 185 (witness's statement that she had been "'too intoxicated'" to remember whether her report was accurate held admissible in light of other indicia of reliability); *Porter*, 986 F.2d at 1017 (recorded statement admissible despite witness's trial testimony

---

Andres [Orozco]." RP (Feb. 2, 2009) at 340. According to Ms. Olivas's statement, Ms. Velasquez was in the car for only moments before "jump[ing] off," apparently at the end of an alley leaving the parking lot. *Id.*

30

that she was "'screwed up'" on drugs at the time statement was made and was not sure she had been accurate).

The trial court recognized that while Ms. Perez's testimony might have been affected by her conflicting loyalties and her and her husband's jeopardy, she, like Ms. Olivas, was equivocal about the accuracy of her statement. Both women sometimes characterized themselves as having been truthful and neither ever clearly recanted what they had said. Having determined that the statements were admissible, the trial court allowed defense counsel to cross-examine each witness on matters bearing on the weight and credibility of their recorded statements as provided by ER 104(e).

Substantial evidence supports the trial court's determination of the preliminary questions required to establish the foundation for admitting the three recorded statements whose admission is challenged on appeal. It did not abuse its discretion in admitting them.

We affirm the convictions. For reasons discussed in the unpublished portion of the opinion, we reverse the sentence and remand for resentencing to a term that includes an enhanced sentence on count one of at least 331 months and a sentence for count one that shall run consecutively to the sentences for counts two through five. If the sentences on counts two through five are to run concurrently, the court shall enter findings and conclusions supporting that exceptional downward sentence. For reasons that, again, are discussed below, we dismiss Mr. Nava's PRP.

31

The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions. RCW 2.06.040.

## Admission of Gang-Related Evidence

Mr. Nava next argues that the trial court erred by admitting gang-related evidence in violation of ER 404(b). He claims there was no evidence that he belonged to a gang, that a gang even existed, or that there was a nexus between the murder of Mr. Masovero and gang membership.

Evidence of gang affiliation may easily be perceived by juries as evidence showing a lawbreaking character, thereby tending to prove the person acted in conformity with that character at the time of a crime. For that reason, its admission is subject to the standards for admitting evidence of "other crimes, wrongs, or acts" provided by ER 404(b). *See State v. Asaeli*, 150 Wn. App. 543, 208 P.3d 1136 (2009). Affiliation with a gang is also protected by the First Amendment right of association and is inadmissible to prove a defendant's beliefs and associations; there must be a nexus between the crime and the gang before evidence of the affiliation is admitted. *State v. Scott*, 151 Wn. App. 520, 526, 213 P.3d 71 (2009) (citing *Dawson v. Delaware*, 503 U.S. 159, 112 S. Ct. 1093, 117 L. Ed. 2d 309 (1992); *State v. Campbell*, 78 Wn. App. 813, 822, 901 P.2d 1050 (1995)). A trial court's decision to admit gang evidence under ER 404(b) is reviewed for

32

abuse of discretion. *State v. Lane*, 125 Wn.2d 825, 831, 889 P.2d 929 (1995); *Scott*, 151 Wn. App. at 527.

Before admitting evidence under ER 404(b), the trial court must (1) find by a preponderance of the evidence that the misconduct occurred, (2) state the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) balance the probative value of the evidence against the danger of unfair prejudice. *State v. Kilgore*, 147 Wn.2d 288, 292, 53 P.3d 974 (2002). It may conduct a hearing to take testimony, but is not required to do so. *Id.* at 294-95.

Here, the trial court found on the record that the gang evidence was relevant to issues of premeditation, motive, and intent, all of which are permitted purposes for offering evidence of other wrongs under ER 404(b). *See State v. Yarbrough*, 151 Wn. App. 66, 210 P.3d 1029 (2009) (gang evidence admissible as to motive); *State v. Boot*, 89 Wn. App. 780, 788-90, 950 P.2d 964 (1998) (admissible as to motive, premeditation); *Campbell*, 78 Wn. App. at 821 (premeditation, motive, and intent).

In challenging the sufficiency of evidence to support the findings required to admit the evidence, Mr. Nava focuses on evidence presented at trial. That is not the proper focus of review, however, because in this case the admissibility of the evidence was decided before trial. At the request of the parties, the trial court heard evidence on the

preliminary questions and decided that gang evidence would be admissible during the

CrR 3.5 hearing that commenced on January 26, 2009.

During that hearing, Sergeant Salinas testified, without objection by the defense,

that Victor Serrano's tag name was Smurf; that a "tag name" was a street monikor used

by gangs; that Mr. Serrano was involved with the Sureño gang claiming the color blue;

that Antone Masovero claimed the color red, the Norteño color; that it came to light in

the Yakima police department's investigation of the Masovero homicide that Cesar Perez,

Andres Orozco, Lance Nanamkin, and Salvador Nava were linked to the Sureño gangs

while Antone Masovero and the other victims seated in the Martinez sedan were affiliates

or members of the Norteño gang; that Lance Nanamkin had been quite upset about the

death of Victor Serrano and that he had drawings and other items indicating his affiliation

with the Sureño gang in his bedroom; that Antone Masovero had been present at the

death of Mr. Serrano and may have handed the weapon to the shooter; and that "in the

gang world, you will have an act occur involving rival gangs and then you will see a

smattering of retaliation type acts occur, and this is what we believe occurred in this

situation." RP (Jan. 26, 2009) at 11-14, 16.

Following this testimony, at the conclusion of the first day of the CrR 3.5 hearing,

it was defense counsel that told the court he "wanted to clear up the aspect of gangs,

whether that should be brought out," and "whether Your Honor's going to allow any kind

of a gang mention before we start talking to the jury." *Id.* at 47. The prosecutor

34

responded that the State wanted to talk about the gang affiliation "with regard to the

motive, to establish premeditation" and asked the court to find that gang evidence was

admissible on the basis of Sergeant Salinas's testimony. *Id.* In replying, even defense

counsel admitted that "[i]t's not easy" to present the case without the evidence "because

this case is so involved with gangs." *Id.* at 49. He argued only that it was possible to

present the case without gang evidence and the court should require the effort, given the

prospect that gang evidence would "poison everybody" and "taint and prejudice" the

trial. *Id.* at 48-49.

> After hearing these arguments, the trial court announced that
>
> I'm inclined to find that gang affiliation and gang activity as it—specific to
> this case, not general, is relevant to this case and the charges and it explains
> the motive and premeditation intent and it's more probative than
> prejudicial. I've already said it's clearly prejudicial, it tends to portray the
> defendant as a law breaker, an outlaw, criminal that in minds of local
> people is a big problem and so if we allow that to come in then it has some
> prejudicial impact but the probative value to explain what happened here
> far outweighs the prejudicial impact. So, I'm going to find that the gang
> issue is relevant and can come in.

*Id.* at 49.

Additional evidence was later offered establishing the relevance of gang

membership to the crime, not the least of which was Mr. Nava's reported statement, in

shooting Mr. Masovero, "[T]hat was for my homie Smurf." But the trial court's ruling

was made much earlier. Sergeant Salinas's testimony at the CrR 3.5 hearing was

sufficient to establish that Mr. Nava belonged to or was affiliated with the Sureño gang

35

and that there was a nexus between that affiliation and the shooting of Mr. Masovero. The trial court did not abuse its discretion.

### Ineffective Assistance of Counsel

Mr. Nava next argues that his trial lawyer provided ineffective assistance of counsel by failing to request a limiting instruction to the jury as to use of the gang evidence.

To establish a claim for ineffective assistance of counsel, the defendant must prove that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Nichols*, 161 Wn.2d 1, 8, 162 P.3d 1122 (2007). Deficient performance is that which falls "below an objective standard of reasonableness based on consideration of all the circumstances." *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Prejudice exists if the defendant can show that "there is a reasonable probability that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different." *Nichols*, 161 Wn.2d at 8.

In evaluating claims for ineffectiveness, courts are highly deferential to counsel's decisions and there is a strong presumption that counsel performed adequately. *Strickland*, 466 U.S. at 689-91. It is well settled that a defense attorney's failure to request an instruction limiting the jury's use of damaging evidence can be explained as a tactical choice, to avoid reemphasizing that evidence. *State v. Humphries*, 170 Wn. App. 777, 797-98, 285 P.3d 917 (2012), *review granted*, 177 Wn.2d 1007 (2013); *Yarbrough*,

36

151 Wn. App. at 90-91; *State v. Price*, 126 Wn. App. 617, 649, 109 P.3d 27 (2005); *State v. Barragan*, 102 Wn. App. 754, 762, 9 P.3d 942 (2000).

Mr. Nava attempts to distinguish these cases by arguing that "[c]ounsel fought to keep out the gang evidence." Br. of Appellant at 34. That does not distinguish this case from *Yarbrough* and the others. It is the fact that the evidence is damaging (and thereby would have been fought) that is the reason for not reemphasizing it with a jury instruction. He also argues that "Nava had nothing to lose from an instruction telling the jury the evidence could not be used to infer bad character or a propensity to violate the law," *id.*—but Mr. Nava did have something to lose: the arguable strategic advantage of jury instructions free from reminders of damaging evidence. This issue is controlled by the well settled Washington case law presuming that when trial counsel does not request a limiting instruction, it is for tactical reasons.

If a party fails to demonstrate deficient representation, we need not consider prejudice. *State v. Foster*, 140 Wn. App. 266, 273, 166 P.3d 726 (2007).

## CROSS APPEAL

The State's cross appeal assigns error to the sentence imposed by the trial court. The court's sentence was an exceptional downward sentence in two respects: Mr. Nava was sentenced below the standard range on count one, the murder count, and the court provided that Mr. Nava's sentences on all counts would run concurrently. The State challenges both departures from standard sentencing. We address the departures in turn.

37

*Exceptional Sentence for Count One: Premeditated First Degree Murder.* Given Mr. Nava's criminal history and offender score, the standard base sentence range for the murder count was 271 to 361 months, while the standard enhanced sentence range was 331 to 421 months. CP at 7. In originally announcing its intended total sentence, the trial court believed it was sentencing Mr. Nava within the standard range for all of his offenses. It learned at the time of presentment of the judgment and sentence that given the mandatory consecutive character of the firearm enhancements, it could impose a total sentence of 520 months only by imposing a base sentence of 220 months for count one (and running the sentences on all counts concurrently, discussed hereafter). The trial court did, then, impose a base sentence of 220 months for count one, with the marginal notation that it was relying for the departure on "the multiple offense policy." CP at 8.

The standard sentence range is presumed to be appropriate for the *typical* felony case. WASH. STATE CASELOAD FORECAST COUNCIL, 2012 WASHINGTON STATE ADULT SENTENCING GUIDELINES MANUAL at 25 (version 20121231). The Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, provides that the court "may impose a sentence outside the standard sentence range for that offense if it finds, considering the purpose of this chapter, that there are substantial and compelling reasons justifying an exceptional sentence." RCW 9.94A.535; *State v. Alexander*, 125 Wn.2d 717, 722, 888 P.2d 1169 (1995). Minimum terms of total confinement provided by RCW 9.94A.540 as mandatory "shall not be varied or modified under RCW 9.94A.535," however. RCW 9.94A.540(1).

38

Where the trial court may and does impose an exceptional sentence, it must set forth its reasons in written findings of fact and conclusions of law. RCW 9.94A.535. The failure to enter the findings and conclusions is harmless where the trial court's oral opinion and the record are sufficiently clear and comprehensive to facilitate effective appellate review. *State v. Bluehorse*, 159 Wn. App. 410, 423, 248 P.3d 537 (2011). Written findings serve in part to inform the Sentencing Guidelines Commission and the public of the reasons for deviating from the standard range, so even where harmless, the remedy of remand for entry of findings is ordinarily ordered. *In re Pers. Restraint of Breedlove*, 138 Wn.2d 298, 311, 979 P.2d 417 (1999).

By statute, we may reverse an exceptional sentence entered by the trial court only if we find "(a) Either that the reasons supplied by the sentencing court are not supported by the record which was before the judge or that those reasons do not justify a sentence outside the standard sentence range for that offense; or (b) that the sentence imposed was clearly excessive or clearly too lenient." RCW 9.94A.585(4). In applying these statutory standards we answer the following questions, under the corresponding standard of review:

> "1. Are the reasons given by the sentencing judge supported by evidence in the record? As to this, the standard of review is clearly erroneous.
> "2. Do the reasons justify a departure from the standard range? This question is reviewed de novo as a matter of law.
> "3. Is the sentence clearly too excessive or too lenient? The standard of review on this last question is abuse of discretion."

*State v. Law*, 154 Wn.2d 85, 93, 110 P.3d 717 (2005) (quoting *State v. Ha'mim*, 132 Wn.2d 834, 840, 940 P.2d 633 (1997)).

The State first argues that the 220-month base sentence for count one violates RCW 9.94A.540(1)(a), which provides for a mandatory minimum term for murder in the first degree of "a term of total confinement not less than twenty years." If the State is correct that it is the *base* sentence, prior to enhancement, that cannot fall below the mandatory minimum, then the sentence imposed for count one cannot stand because RCW 9.94A.535 explicitly provides that the mandatory minimum is not subject to the trial court's discretion to impose an exceptional downward sentence. The State is wrong, though, in looking to the base sentence.

"'A sentencing enhancement is added to the base sentence to reach a single presumptive sentence for a particular offense; it is not itself a separate sentence.'" *State v. DeRyke*, 110 Wn. App. 815, 822, 41 P.3d 1225 (2002) (quoting *State v. Flett*, 98 Wn. App. 799, 806, 992 P.2d 1028 (2000)), *aff'd*, 149 Wn.2d 906, 73 P.3d 1000 (2003); *In re Postsentencing Review of Gutierrez*, 146 Wn. App. 151, 155, 188 P.3d 546 (2008). RCW 9.94A.533 provides that "additional times shall be added to the standard sentence range for felony crimes" where the offender was armed with a firearm. RCW 9.94A.599, dealing with statutory maximum sentences, provides, "If the addition of a firearm or deadly weapon enhancement increases the sentence so that it would exceed the statutory

40

maximum for the offense, the portion of the sentence representing the enhancement may not be reduced." There would be no reason for this language if, as the State contends, it is the unenhanced base sentence that must fall within the bounds set by the statutory minimum and maximum sentences.

The State also argues that the "multiple offense policy," which was the only reason offered by the court for deviating from the standard range, is not a reason justifying departure from the standard range. RCW 9.94A.535(1) provides a nonexclusive list of mitigating factors for awarding exceptional sentences, one of which is a finding that "[t]he operation of the multiple offense policy of RCW 9.94A.589 results in a presumptive sentence that is clearly excessive in light of the purpose of this chapter, as expressed in RCW 9.94A.010." RCW 9.94A.535(1)(g). RCW 9.94A.589 sets forth the rules regarding whether sentences run consecutively or concurrently. Generally, sentences for multiple offenses set at one sentencing hearing are served concurrently unless there are two or more separate serious violent offenses or weapon offenses.

The State argues that the "multiple offense policy" as used in RCW 9.94A.535(1)(g) means only one thing: that where there are multiple offenses the sentences for which presumptively run *concurrently*, the standard range is determined with a "numerical offender score that in one event, place[s] the defendant in or near the top of the level of punishment possible for the charged crime." Reply Br. of Resp't at 13 (citing *State v. Sanchez*, 69 Wn. App. 255, 848 P.2d 208 (1993) and *State v. Hortman*, 76

41

Wn. App. 454, 886 P.2d 234 (1994), both of which involved controlled drug buys that were repeated even after police had probable cause for arrest, presumably to increase the offender's standard range).

The State's example is certainly one context in which the multiple offense policy can provide a basis for an exceptional sentence downward, but applying the policy of presumptively running sentences for multiple separate serious violent offenses *consecutively* might also result in a case in which the trade-off of a lower offender score for most of the crimes will not compensate for the fact that the incremental sentence for each additional crime is out of proportion to its incremental harm. *Cf. State v. McKee*, 141 Wn. App. 22, 29-30, 167 P.3d 575 (2007) (exceptional concurrent sentencing found unjustified by the facts, but court did not question the multiple offense policy as a basis in a proper case). This, too, could present a case in which the difference between the effect of one offense and the cumulative effect of the others is "nonexistent, trivial, or trifling," justifying an exceptional sentence. *Cf. Sanchez*, 69 Wn. App. at 261 (announcing this analysis where sentencing is presumptively concurrent). In the end it does not matter whether we characterize only one of these contexts or both as involving the "multiple offense policy," because the trial court is not limited by the statutory examples and can rely on any disproportionality that it reasonably concludes results from applying the rules set forth in RCW 9.94A.589.

Nevertheless, the reason offered for an exceptional sentence must relate to the crime for which the defendant is being sentenced and make it less egregious, distinguishing the defendant's crime from others in the same category. *State v. Fowler*, 145 Wn.2d 400, 404, 38 P.3d 335 (2002). No "multiple offense policy" can explain why the presumptive sentence for a defendant's most serious multiple offense, which the trial court recognized as having an effect completely distinct from the assaults, should receive a sentence below the standard range. *See State v. Bridges*, 104 Wn. App. 98, 15 P.3d 1047 (2001) (in multiple offense case, an exceptional sentence that was less than the standard sentence for one conviction was too lenient and an abuse of discretion). The trial court offered no reason for reducing the sentence for murder below the 331-month minimum of the enhanced standard range. It should have imposed a sentence for murder within the standard range.

*Exceptional Provision that Sentences on All Counts Would Run Concurrently.*
The State also challenges the trial court's decision to depart from the presumption that Mr. Nava's sentences for serious violent offenses should run consecutively to one another, and concurrently to his sentence for unlawful possession of a firearm. Murder and first degree assault are serious violent offenses. The first five counts on which Mr. Nava was convicted were separate criminal conduct, having involved separate victims. *See, e.g., State v. Wilson*, 125 Wn.2d 212, 220, 883 P.2d 320 (1994). The trial court accepted the defense argument that it should depart from the presumption, although in

first announcing Mr. Nava's sentence, it stated that it would run only counts two through five concurrently, leaving the murder count to run consecutive to those counts. It was after learning that it could achieve its intended 520-month total sentence only by running all of the sentences concurrently that it provided for the concurrent running of the murder sentence as well.

In advocating for exceptional concurrent sentencing, the defense argued that the multiple offense policy resulted in a sentence that was clearly excessive. The State argues that the facts do not support the trial court's implicit finding that Mr. Nava's six crimes did not have meaningful separate effects that required separate punishment.

In reviewing a trial court's conclusion that the multiple offense policy results in a sentence that is clearly excessive, we apply the same standard first announced as the appellate standard to determine whether a sentence imposed by the trial court is "clearly excessive" within the meaning of RCW 9.94A.585(4): that being whether "the difference between the effects of the first criminal act and the cumulative effects of the subsequent criminal acts is nonexistent, trivial or trifling." *Hortman*, 76 Wn. App. at 463-64; *State v. Kinneman*, 120 Wn. App. 327, 342, 84 P.3d 882 (2003); *McKee*, 141 Wn. App. at 33.

Here, the trial court did not analyze whether the difference in the effect of the murder and the cumulative effects of the four assaults was nonexistent, trivial, or trifling. In initially announcing that it would run the sentences for the assaults concurrently, but

44

consecutive to the sentence for murder, it arguably had a sufficient reason. It accepted

the position of the defense, which had argued:

> [A]t least one or two, I think possibly two of the individuals charged in the first degree assault charges didn't even show up for trial. And all of the bullets were aimed towards the victim here. I believe there might have been about a total of four bullets but they were into the back area. One I believe was in the door panel, another was above the door and then the two, of course, that hit the victim. So they're all in the back seat area but the jury found him guilty of everything[,] even the two people in front there . . . There really was just one—
>
> . . . .
>
> . . . There's no indication that any of the other people in the car were the object of the shooter in this situation.

RP (June 12, 2009) at 18. Consistent with its original intent to run the murder sentence

consecutively, the court pointed out that Mr. Nava nonetheless did stand outside the car

and fire at least five bullets, with "human beings sitting in the car." *Id.*

The trial court might reasonably have concluded that the difference between the

four assaults, by themselves, was trivial, justifying exceptional concurrent sentencing.

The record provides no basis for finding that there was a nonexistent, trivial, or trifling

difference between the murder of Mr. Masovero and the firing of four more shots into the

occupied car, however. The provision that the murder sentence run concurrently with the

assault sentences cannot stand. In order for the provision that the sentences for the four

assaults run concurrently to stand, that departure must be supported by adequate findings

and conclusions.

We therefore reverse the sentence and remand for resentencing and entry of any necessary findings and conclusions.

PERSONAL RESTRAINT PETITION

In his PRP, Mr. Nava challenges the special verdict instruction given to the jury. He relies on the nonunanimity rule for such verdicts articulated in *State v. Bashaw*, 169 Wn.2d 133, 234 P.3d 195 (2010) and *State v. Goldberg*, 149 Wn.2d 888, 72 P.3d 1083 (2003). The Washington Supreme Court overruled *Bashaw* and *Goldberg* in *State v. Guzman Nuñez*, 174 Wn.2d 707, 285 P.3d 21 (2012) on the very issue identified by Mr. Nava's PRP. *Guzman Nuñez* makes clear that the trial court's instruction was correct and that Mr. Nava was properly sentenced on the basis of the jury's special verdicts.

STATEMENT OF ADDITIONAL GROUNDS

In a pro se statement of additional grounds (SAG), Mr. Nava states five.

The first is that the court improperly allowed Police Officer Mark Lewis to continue to read from his police report, rather than use the report to refresh his recollection, in violation of ER 612. Although the prosecutor in questioning the officer originally suggested that he review his report to refresh his recollection, the officer testified that even after reviewing the report, he could not recall the matters reflected in it. The prosecutor then established the foundation for admitting the police report as a recorded recollection under ER 803(a)(5) and the trial court allowed it to be read into the record on that basis. "If admitted, the memorandum or record may be read into evidence

46

but may not itself be received as an exhibit unless offered by an adverse party." *Id.* The court did not err.

The second is that the trial court erred when it allowed a portion of the tape-recorded statement of Ms. Perez to be replayed to the jury. In support of the grounds, he cites *State v. Koontz*, 145 Wn.2d 650, 657, 41 P.3d 475 (2002) and *State v. Monroe*, 107 Wn. App. 637, 643-45, 27 P.3d 1249 (2001), which hold that a court should not allow the jury to review witness testimony during deliberations if the result might be to unduly emphasize the testimony. Here, the court replayed a portion of the recording of Ms. Perez's police interview that it described as "fluttering" after one juror complained and eight others agreed that it had been difficult to hear that portion. The portion was replayed during trial, on the same day Ms. Perez testified. It cannot be said to have been "replayed" in the sense that concerned the courts in *Koontz* and *Monroe* because here almost all of the jurors were hearing the recording comprehensibly for the first time. Undue emphasis was not a concern and there was no abuse of discretion.

The third is that the court violated "Rule 403(9)" when it admitted evidence not disclosed in discovery and counsel claimed surprise. SAG at 2. Mr. Nava fails to direct us to the rulings about which he complains; in any event, "[s]urprise is not a basis for excluding relevant evidence under ER 403 unless the opposing party will suffer unfair prejudice." *Eagle Group, Inc. v. Pullen*, 114 Wn. App. 409, 417, 58 P.3d 292 (2002). No prejudice is identified.

47

The fourth is that the prosecutor committed misconduct by commenting on evidence not in the record. Mr. Nava claims that the prosecutor said Ms. Velasquez had a key chain that said "I love Chava" on it. SAG at 2 (citing RP (Feb. 2, 2009) at 394). However, the prosecutor merely asked the witness if she had such a key chain and she denied it. It was proper for the prosecutor to ask the question, which would bear on bias, if he had a good faith basis for it. There is no assertion or demonstration that he did not.

Finally, Mr. Nava contends his arrest warrant was invalid because it was not based upon probable cause and that the prosecutor made false statements of fact in his affidavit supporting the application for the arrest warrant. The arrest warrant was not challenged in the trial court and we will not consider a challenge for the first time on appeal.

We affirm the convictions. We reverse the sentence and remand for resentencing to a term that includes an enhanced sentence on count one of at least 331 months and a sentence for count one that shall run consecutively to the sentences for counts two through five. If the sentences on counts two through five are to run concurrently, the

court shall enter findings and conclusions supporting that exceptional downward

sentence. We dismiss Mr. Nava's PRP.

Siddoway, A.C.J.

WE CONCUR:

Brown, J.

Kulik, J.