[No. 61848-2-I.   Division One.   September 8, 2009.]

THE STATE OF WASHINGTON, *Respondent*, v. JARRAY FRANSICUS WHITE, *Appellant*.

---

*Andrew P. Zinner* (of *Nielsen, Broman & Koch, PLLC*), for appellant.

*Daniel T. Satterberg, Prosecuting Attorney*, and *Andrea R. Vitalich, Deputy*, for respondent.

¶1 APPELWICK, J. — White appeals his conviction for domestic violence felony violation of a court order, arguing the trial court violated his right to a public trial. Although the trial court closed the courtroom in order to conduct an in camera review of a witness's claimed Fifth Amendment right, the witness withdrew the asserted right and no hearing occurred. Because the trial court reversed the closure order without conducting any proceeding, we conclude a new trial is not required. We affirm the conviction, but we remand for new sentencing.

## FACTS

¶2 In April 2007, a no-contact order prohibited Jarray White from having contact with Ozaria Whitson. White and Whitson had dated for approximately six months prior to the no-contact order. On July 4, 2007, Whitson took a public bus from near her home in Renton, Washington, toward downtown Renton. Along the way, the bus stopped at the 1700 block of South Puget Drive, where White boarded. He sat next to Whitson. White indicated that he wanted to talk. The two disembarked at the Renton park-and-ride. As Whitson turned, White punched her on the right side of her head. He proceeded to hit Whitson three or four more times on the head before fleeing. Mary Jo Linebaugh, a bystander, called 911. Whitson also called 911 to report the assault. During the call, she identified White as her attacker.

¶3 Officer Mark Coleman of the Renton Police Department responded to the 911 calls reporting an assault at the Renton park-and-ride. Upon arrival, he found Whitson crying, upset, and bleeding from the right ear. Coleman

interviewed Whitson to establish if a crime had occurred. Whitson gave both an oral and a written statement.

¶4 The State charged White with one count of domestic violence felony violation of a court order.

¶5 At trial, the State offered the testimony of two eye-witnesses, Linebaugh and Garry Sondergaard. Both testified that they heard and saw a loud argument between a man and a woman. Linebaugh testified that she saw a man kick the woman before he ran away. Sondergaard testified that the man struck the woman with one hand, while holding onto her hair with the other. Neither affirmatively identified White as the assailant, but both indicated that it could have been him.

¶6 The State called Whitson to testify. Whitson immediately pleaded the Fifth Amendment. She explained that she could not testify without incriminating herself. The court appointed independent counsel to advise Whitson regarding her claimed Fifth Amendment privilege.

¶7 To facilitate an in camera review of the Fifth Amendment claim, the court cleared the courtroom of spectators. Over the objections of his counsel, the court also excluded White. The court then explained on the record, "My ruling was, this being an in camera hearing, we have cleared the courtroom of spectators. . . . And I have ruled against the presence of the defendant. So we will proceed." Subsequently, the court engaged in the following exchange with the witness, Whitson:

Q   You indicated in our last session in this matter that you intend to assert a Fifth Amendment privilege against testifying in this case, is that correct.

A   I do, yes.

Q   Have you had the chance to confer with your attorney, Mr. Tackitt?

A   Yes.

Q   Do you still intend to do that?

A   Well, no. It doesn't really apply.

Q   So you do not intend to assert your Fifth Amendment privilege; is that correct?

A   No. I would rather go ahead and give my testimony so I can go to work, if you don't mind.

THE COURT: That resolves this matter. Thank you very much. You may step down.

The court determined the matter had been resolved, the courtroom reopened, White returned, and Whitson subsequently testified in open court.

¶8 Whitson testified that she was attacked on July 4, 2007, but had no recollection of how it occurred. Whitson stated that she was intoxicated and consequently could not remember any details of the assault. But, she testified that White was not present on July 4. When presented with a copy of her signed police statement taken on the day of the assault, describing White's assault on her, Whitson said she could not remember if the statements were true. The State played a 911 tape, and Whitson identified herself as the speaker. She testified that she could not remember calling 911.

¶9 The State also presented the testimony of Officer Coleman, who testified that on July 4, 2007, he responded to the 911 calls made by Linebaugh and Whitson. After describing the method he uses to document an assault, including taking the victim's statement, the court admitted the police statement given by Whitson. The statement read:

On July 4th, 2007 about 1426, I caught the bus from my residential neighborhood at Tiffany Park in Renton. I got on the bus and began riding into Renton. A couple minutes later, at about the 1700 block of South Puget Drive, ex-boyfriend Dre F. White got on the bus in the Rolling Hills neighborhood. White sat next to me in my seat and asked if he could talk to me. My impression is he was waiting for me because he lives in South Seattle. White rode to the park-and-ride at 205 South 7th Street in Renton. White asked if he could talk to me. I said what for? White then punched me with my back turned. His closed-fisted right-handed punch landed on the right side of my head. White then walked off. I started screaming. White

walked back to me and was saying something to me. He then started punching me on the right side of my head again with the closed fist about two to three more times. White then threw me to the ground and stood over me and screamed at me, saying the word "fuck" a lot. White than [sic] ran northwest out of the parking lot. He is 38 years old and 5'8["], skinny and bald. He was wearing a white T-shirt with brown sleeves, blue jeans, and was carrying a small olive green gym bag. His blows hurt, the right side of my head bled, and I'm angry he has done this to me.

Officer Coleman also testified to the existence of the no-contact order, a certified copy of which was admitted at trial. The no-contact order is not included in the record on appeal.

¶10 After the jury found White guilty of one count of domestic violence felony violation of a court order, the court sentenced him to 60 months plus 9-18 months of community custody. He appeals.

## DISCUSSION

### I. *Right to Public Trial*

¶11 The right to a public trial is guaranteed by the state constitution. Article I, section 10 of the Washington State Constitution guarantees that justice in all cases shall be administered openly. And article I, section 22 of our constitution guarantees that "[i]n criminal prosecutions the accused shall have the right . . . to have a speedy public trial." These same rights are also guaranteed in the Sixth Amendment to the United States Constitution. Whether a defendant's right to a public trial has been violated is a question of law that we review de novo. *State v. Brightman*, 155 Wn.2d 506, 514, 122 P.3d 150 (2005).

¶12 White contends the trial court violated his constitutional right to a public trial when it conducted an in camera review of Whitson's assertion of the Fifth Amendment. Based on *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995), White argues that the trial court was required to

conduct an evaluation of the compelling interest for closure, weighed against his right to a public trial, prior to closure of the courtroom. He argues that reversal of his conviction is mandatory under *Bone-Club* and its progeny.

¶13 In *Bone-Club*, the defendant argued that "the temporary, full closure of his pretrial suppression hearing during the testimony of the undercover police officer violated his [public trial right]." *Id.* at 257. The Washington State Supreme Court agreed and unanimously held that, to protect a defendant's article I, section 22 constitutional right to a public trial, a trial court faced with a closure request must apply the "strict, well-defined standard" it had previously prescribed to protect the public's right to open proceedings. *Id.* at 258; WASH. CONST. art. I, § 10; *see Federated Publ'ns, Inc. v. Kurtz*, 94 Wn.2d 51, 62-64, 615 P.2d 440 (1980) (balancing defendant's and public's competing constitutional interests by applying five "workable guidelines" drawn from "principles suggested" in *Gannett Co. v. DePasquale*, 443 U.S. 368, 400-03, 99 S. Ct. 2898, 61 L. Ed. 2d 608 (1979) (Powell, J., concurring)). In *Bone-Club*, the court stated, "Although the public trial right may not be absolute, protection of this basic constitutional right clearly calls for a trial court to resist a closure motion except under the most unusual circumstances." 128 Wn.2d at 259. The court adopted a five-part test requiring the evaluation of the following:

"1. The proponent of closure or sealing must make some showing [of a compelling interest], and where that need is based on a right other than an accused's right to a fair trial, the proponent must show a 'serious and imminent threat' to that right.

"2. Anyone present when the closure motion is made must be given an opportunity to object to the closure.

"3. The proposed method for curtailing open access must be the least restrictive means available for protecting the threatened interests.

"4. The court must weigh the competing interests of the proponent of closure and the public.

"5. The order must be no broader in its application or duration than necessary to serve its purpose."

*Id.* at 258-59 (alteration in original) (quoting *Allied Daily Newspapers v. Eikenberry*, 121 Wn.2d 205, 210-11, 848 P.2d 1258 (1993)). The trial court must consider alternatives and balance the competing interests on the record. *Id.* at 260. Appellate review of a trial judge's consideration of these factors is as found in the record; we do not consider them for the first time on appeal. *State v. Frawley*, 140 Wn. App. 713, 721, 167 P.3d 593 (2007).

¶14 In *In re Personal Restraint of Orange*, the court looked first to the plain language of the trial court's order to determine whether the courtroom had been fully closed to the public. 152 Wn.2d 795, 807-08, 100 P.3d 291 (2004). In addition, the court explained that "were we to define the nature of the closure not by the presumptive effect of the plain language of the ruling itself but by additional facts about the closure educed at the posttrial evidentiary hearing, the closure in the present case was, at the very least, the same type of closure at issue in *Bone-Club*, a temporary, full closure." *Id.* at 808. In *Orange*, the trial court failed to conduct a *Bone-Club* analysis and, "[p]lainly, the record in this case 'lacks any hint the trial court considered Defendant's public trial right, much less engaged in a detailed review required to protect that right.'" *Id.* at 811-12 (quoting *Bone-Club*, 128 Wn.2d at 260-61). Therefore, the court reversed the conviction and adopted the verbatim holding of *Bone-Club*, explaining that "'[w]e hold the trial court's failure to follow the five-step closure test . . . violated Defendant's right to a public trial under section 22.'" *Id.* at 812 (second alteration in original) (quoting *Bone-Club*, 128 Wn.2d at 261).

¶15 In reaching this conclusion, the majority in *Orange* rejected the approach of the concurrence by Justice Madsen, which suggested the defendant had a burden to show both that the closure order was effectuated and that the defendant's rights were abridged. *Id.* at 812-13. The majority held that the concurrence's approach invites a

waste of court resources in posttrial evidentiary hearings, which would result in unnecessary delays in appellate review. *Id.* at 814. If *Bone-Club* stands for the proposition that without a consideration on the record of the five factor test, any closure of the courtroom violates a defendant's constitutional right, even if no proceeding is conducted during the closure, then White is correct and reversal is warranted. Under that rule, a new trial would be required even where the court rescinded the order immediately upon its implementation, where there was no proceeding conducted that could have violated the defendant's rights, and where retrial of the case would be an enormous waste of court resources and would result in unnecessary delays.

¶16 Here, the closure occurred without consideration of the factors. The court convened counsel for a hearing, but no hearing occurred. Whitson had conferred with appointed counsel and immediately withdrew her claimed Fifth Amendment privilege, thus eliminating the need for the in camera proceeding. In the present case, the courtroom was reopened without any proceeding that could have violated the defendant's rights and the trial resumed.

¶17 Moreover, in camera proceedings by definition, by historical practice predating this state's constitution, and pursuant to case law predating *Bone-Club* were not open to the public. In addition, we note that in determining whether a witness is entitled to protection of the privilege against self-incrimination, use of in camera proceeding or sealed record is appropriate. *In re Pers. Restraint of Hutchinson*, 147 Wn.2d 197, 204, 53 P.3d 17 (2002); *Eastham v. Arndt*, 28 Wn. App. 524, 533-34, 624 P.2d 1159 (1981); *Seventh Elect Church v. Rogers*, 34 Wn. App. 105, 114-15, 660 P.2d 280 (1983); *State v. Berkley*, 72 Wn. App. 12, 20, 863 P.2d 133 (1993). Here, the trial court conducted a routine in camera review of Whitson's claimed privilege. No public trial right is being abridged by conducting these proceedings. Applying the five factors before an in camera review would serve little purpose, because proper in camera proceedings would always satisfy them. If the defendant

claimed the scope of the in camera proceeding expanded in a manner to violate the public trial right, such an abuse would necessarily be evaluated after the fact. Under these facts, we conclude no violation of White's constitutional rights occurred. Reversing on these facts would waste judicial resources without serving the ends of justice.

## II. *Admission of Prior Recorded Recollection*

¶18 White also contends that the trial court erred by admitting a written statement, by Whitson, under ER 803(a)(5). Specifically, he argues that a statement following the incident fails to comply with the ER 803(a) requirements for admission, and that the trial court failed to properly analyze the evidence to determine admissibility.

¶19 ER 803(a)(5) provides an exception to the hearsay rule for

[a] memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness' memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

Admission is proper when the following factors are met: (1) the record pertains to a matter about which the witness once had knowledge, (2) the witness has an insufficient recollection of the matter to provide truthful and accurate trial testimony, (3) the record was made or adopted by the witness when the matter was fresh in the witness's memory, and (4) the record reflects the witness's prior knowledge accurately. *State v. Mathes*, 47 Wn. App. 863, 867-68, 737 P.2d 700 (1987). The admission of statements under ER 803(a)(5) is reviewed for an abuse of discretion. *State v. Castellanos*, 132 Wn.2d 94, 97, 935 P.2d 1353 (1997); *State v. Strauss*, 119 Wn.2d 401, 417, 832 P.2d 78 (1992). An abuse of discretion occurs only when no reason-

able person would take the view adopted by the trial court. *State v. Huelett*, 92 Wn.2d 967, 969, 603 P.2d 1258 (1979).

¶20 In *State v. Alvarado*, this court held that the requirement that a recorded recollection accurately reflect the witness's knowledge may be satisfied without the witness's direct verification of accuracy at trial. 89 Wn. App. 543, 551, 949 P.2d 831 (1998).[1] Therefore, "[t]he court must examine the totality of the circumstances, including (1) whether the witness disavows accuracy; (2) whether the witness averred accuracy at the time of making the statement; (3) whether the recording process is reliable; and (4) whether other indicia of reliability establish the trustworthiness of the statement." *Id.* at 551-52.

¶21 White argues that the State failed to establish that the police statement accurately reflected Whitson's prior knowledge of the event or that it is accurate under the *Alvarado* test. White correctly notes that Whitson did not testify that the statement accurately reflected her prior knowledge. Moreover, White claims that the police statement fails under the *Alvarado* test because Whitson explicitly testified that White was not at the park-and-ride on July 4, 2007, thus disavowing the accuracy of the statement. White also argues that there is no basis to support the trustworthiness of the statement, as recorded by Officer Coleman.

¶22 The State counters that in domestic violence cases, other indicia, even where the victim denies making the statement, may establish the trustworthiness and accuracy of a recorded statement. *State v. Derouin*, 116 Wn. App. 38,

---

[1] In *Alvarado*, a man told police he was an eyewitness to a murder and gave police three statements. 89 Wn. App. at 546. In two statements, the man said that he was an eyewitness to a murder and named the defendant as the shooter. *Id.* But, at trial, the witness denied being at the scene of the shooting. *Id.* at 547. Although his testimony differed from the statements, the court held that the statements were admissible under ER 803(a)(5), because the witness did not expressly disavow the accuracy of them. *Id.* at 552-53. Rather, at the time he made the statements, the witness asserted that they were accurate. *Id.* In addition, the witness gave two of the statements on the same day, only eight days after the murder, and the statements were consistent and reflected a "detailed and fairly comprehensive knowledge of the crime." *Id.*

45-46, 64 P.3d 35 (2003). In *Derouin*, the victim of domestic violence provided a written statement to police but at the trial testified that she did not recall giving the statement to the police and could not recall anything about the incident. *Id.* at 41. We held the trial court erred in not admitting the statement as a prior recorded recollection, because the victim had never disavowed the accuracy of the prior statement. Instead she denied any recollection of it. *Id.* at 46. At the time the victim made the statement, she signed it as recorded by the officer after being warned that she was doing so under penalty of perjury. *Id.* Moreover, although the statement had been written by a police officer, the accuracy of "the recording process was not so unreliable as to prevent the statement's admission. Any inaccuracies within the statement due to the recording process can be argued at trial and should go to the weight, not the admissibility of the evidence." *Id.* Last, because other indicia of reliability weighed in favor of admitting the statement, the statement was erroneously excluded. *Id.* at 47.

¶23 Here, Officer Coleman testified that he wrote the statement as narrated by Whitson. He then read it back to Whitson, who had an opportunity to correct any errors. Subsequently, Whitson signed both pages, under penalty of perjury, and initialed each to show the beginning and end of the statement. Whitson testified that she spoke to a police officer on the day of the assault. When presented with a copy of her statement to police, Whitson identified the signatures on the statement as hers. But Whitson could not remember if the statement accurately reflected what she told the police, because she was "too intoxicated" on July 4. Officer Coleman testified that he did not observe any signs that Whitson was intoxicated on the day of the assault. While upset, she was "certainly functional." White emphasizes that Whitson testified that she did not see him on the day of the assault, thereby undermining the accuracy of the statement she gave the police. But, Whitson herself, even after reading the statement on the stand, did not disavow the accuracy of the statement.

¶24 Here, other evidence of reliability weighs in favor of admitting the statement. On the 911 tape, Whitson identifies White as her attacker. Whitson testified that it is her voice on the tape. The totality of the circumstances support the trial court's ruling that the police statement is supported by sufficient indicia of reliability. We hold that the trial court did not abuse its discretion in admitting Whitson's statement.

¶25 The remainder of this opinion has no precedential value. Therefore, it will be filed for public record in accordance with the rules governing unpublished opinions.

ELLINGTON and LEACH, JJ., concur.

Review denied at 168 Wn.2d 1015 (2010).