

FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2014 FEB 18 AM 9: 31

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | NO. 68940-1-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| JOSHUA DALE MONSON, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: February 18, 2014 |

LAU, J. — During Joshua Monson's murder trial, a juror expressed general concern about her own safety after encountering an unidentified woman in the courthouse parking lot. Monson contends the trial court's refusal to grant his motion to excuse the juror for bias violated his right to a fair trial. Because the trial court properly exercised its discretion in denying Monson's motion to excuse the juror for bias and Monson's statement of additional grounds for review lacks merit, we affirm Monson's murder and firearm possession convictions.

## FACTS

The State charged Monson with first degree premeditated murder and second degree unlawful possession of a firearm, alleging that he shot Brian Jones in the head

on January 2, 2011. On the third day of trial, the trial court questioned a juror in court, on the record, about an incident she had reported to the court bailiff:

> THE COURT: Have a seat anywhere, please. The bailiff let me know that you had some safety concerns that arose in your mind. I thought maybe you could tell us the concerns that you had.
> JUROR: Oh, I just saw somebody—I was crossing the—the parking lot last Friday, and there was just happened to be, like, I didn't see the car, the van coming, and so when I separated from the other juror, I just cross it really quick. And then there's a van that came in, and I stopped a little bit and then looked at the person who was driving, and then when she was going up on the ramble riding [sic] I just kind of look who was it, and then she was still looking at me when I was about to get into my door.

Report of Proceedings (RP) (Apr. 30, 2012) at 10. The juror could not identify the woman but believed she was not a witness in the case. She also acknowledged uncertainty as to the woman's connection, if any, to the case.

The court questioned her about the incident's effect on her ability to remain "fair and impartial." RP (Apr. 30, 2012) at 11. The juror responded, "With that, no." RP (Apr. 30, 2012) at 11. She explained, "It's not. It's just about, you know, knowing how are we going to be safe, yeah. So it was not a question at that time. It's just, you know, in general." RP (Apr. 30, 2012) at 11.

The court also allowed defense counsel to question the juror.[1] Defense counsel asked the juror to explain her safety concern:

> [DEFENSE]: .... Do you have a sense that Mr. Monson or his family or somebody associated with him might be looking for you and do some damage to you?
> JUROR: That's a question.
> [DEFENSE]: And it concerns you.
> JUROR: Yes.

---

[1] The deputy prosecutors asked the juror no questions.

-2-

RP (Apr. 30, 2012) at 12-13. The juror disagreed with defense counsel's comment

suggesting the incident might affect her ability to remain impartial:

> [DEFENSE]: O.K. And that's the kind of thing I'm going to guess that would make it hard for you to feel neutral about Mr. Monson and the charge.
> JUROR: I don't think it that way, Mr. Peale. It's—or I don't see it that way.
> [DEFENSE]: Sure. O.K.
> JUROR: Like, you know, I don't have any judgment that way because of that so it's—because everyone has its own decision.
> [DEFENSE]: Sure.
> JUROR: Yeah. And it—I don't think I—I know what you're trying to ask me like I'll be negative towards him.

RP (Apr. 30, 2012) at 13. Defense counsel clarified, "And so my concern is whether or

not, because you're afraid, it would make you a different kind of juror than if you were

not afraid." RP (Apr. 30, 2012) at 13-14.

> [DEFENSE]: . . . I would be concerned in a case like this that you're afraid of people when you're having to make a decision that's about a case where someone's been hurt.
> JUROR: You're saying that I can—I will—I already have that thought to be impartial because of my fear? Is that what you're saying?
> [DEFENSE]: That's what I'm trying to find out, yeah.
> JUROR: Yeah. I don't think so.
> [DEFENSE]: O.K. So what's going to happen as the case goes on and you hear more information, do you think, about things that have happened that may be unpleasant and may be frightening? You see more people that are upsetting. Do you think it will be more of an issue or less of an issue?
> JUROR: I think it will be fair.

RP (Apr. 30, 2012) at 14. Defense counsel continued to express concern to the juror

about how the incident might affect her fairness during the remaining trial. The juror

repeated that her primary concern was over safety.

The court heard argument from counsel regarding the juror's fitness to serve.

The State deferred to the court, noting it was difficult to predict whether the juror's safety

concern would ultimately prejudice or benefit Monson. Defense counsel argued:

On [the juror], the words she used appeared to be neutral, the demeanor she expressed did not. And the need to express her concern, I think, was something more than just a general awareness of her circumstances. I believe that she has expressed a bias that she cannot control, and I would ask that she be excused.

RP (Apr. 30, 2012) at 16-17. The court observed that the juror associated the woman in the van with the defendant. But it noted, "[The juror] certainly states that she can set that aside and overcome it . . . ." RP (Apr. 30, 2012) at 17.

In an oral ruling, the court denied Monson's motion to excuse the juror. It explained that the juror's fear was primarily a reaction to earlier testimony that Monson "was involved in a methamphetamine-using group of people." RP (Apr. 30, 2012) at 97. It concluded that evidence of the juror's generalized fear of "that realm of society" did not indicate that "she made any decision about the way the defendant is or is not the shooter in this particular matter." RP (Apr. 30, 2012) at 97. It summarized, "[The juror's] answers satisfied me that she believes that she can decide this case based on the evidence and the law given to her." RP (Apr. 30, 2012) at 97.

The jury convicted Monson of first degree premeditated murder and second degree unlawful possession of a firearm. The court imposed a standard range sentence with a firearm enhancement. Monson appeals.

## ANALYSIS

Citing RCW 2.36.110 and CrR 6.5, Monson contends that the trial court erroneously denied his mid-trial motion to excuse the juror for demonstrated bias. He claims: "[The juror] was concerned someone connected with the trial was watching her and that she might be harmed or influenced by people associated with Monson. And while the juror said she thought she could be fair, her demeanor apparently suggested

otherwise." Br. of Appellant at 14. The State contends that the court properly exercised its discretion in denying the motion.

The federal and state constitutions guarantee the right to an impartial jury in criminal prosecutions. U.S. Const. amend. VI; Wash. Const. art. I, § 22; State v. Davis, 141 Wn.2d 798, 824-25, 10 P.3d 977 (2000). Washington law also protects the right by statute and by court rule. By statute:

> It shall be the duty of a judge to excuse from further jury service any juror, who in the opinion of the judge, has manifested unfitness as a juror by reason of bias, prejudice, indifference, inattention or any physical or mental defect or by reason of conduct or practices incompatible with proper and efficient jury service.

RCW 2.36.110. By court rule, "If at any time before submission of the case to the jury a juror is found unable to perform the duties the court shall order the juror discharged, and the clerk shall draw the name of an alternate who shall take the juror's place on the jury." CrR 6.5. The statute "provides the grounds for which the court may dismiss a juror," while the court rule establishes procedures governing the replacement of excused jurors. State v. Depaz, 165 Wn.2d 842, 852, 204 P.3d 217 (2009); see also State v. Rafay, 168 Wn. App. 734, 821, 285 P.3d 83 (2012) ("RCW 2.36.110 governs the removal of jurors."). Together, RCW 2.36.110 and CrR 6.5 "place a 'continuous obligation' on the trial court to investigate allegations of juror unfitness and to excuse jurors who are found to be unfit, even if they are already deliberating."[2] State v. Elmore, 155 Wn.2d 758, 773, 123 P.3d 72 (2005).

"The question for the judge is whether the challenged juror can set aside preconceived ideas and try the case fairly and impartially." Hough v. Stockbridge, 152

---

[2] Given our resolution of this issue, we need not address the State's reliance on RCW 4.44.170's challenges for cause.

Wn. App. 328, 341, 216 P.3d 1077 (2009) (trial court properly exercised discretion to retain juror who authored note asserting that the defendant was delusional and in need of a mental health evaluation, given the absence of evidence that the juror could not remain fair and impartial).

We review the trial court's decision for abuse of discretion. Elmore, 155 Wn.2d at 768; see, e.g., State v. Jorden, 103 Wn. App. 221, 226, 11 P.3d 866 (2000) (trial court properly exercised its discretion under RCW 2.36.110 and CrR 6.5 to excuse and replace inattentive juror mid-trial).

> Under an abuse of discretion standard, the reviewing court will find error only when the trial court's decision (1) adopts a view that no reasonable person would take and is thus "manifestly unreasonable," (2) rests on facts unsupported in the record and is thus based on "untenable grounds," or (3) was reached by applying the wrong legal standard and is thus made "for untenable reasons."

State v. Sisouvanh, 175 Wn.2d 607, 623, 290 P.3d 942 (2012) (internal quotation marks omitted) (quoting State v. Rohrich, 149 Wn.2d 647, 654, 71 P.3d 638 (2003)).

Here, in response to questioning by the trial court and extensive questioning by defense counsel, the juror repeatedly expressed confidence that she would remain impartial, despite her generalized safety concern. The court asked, "Is there anything about your experience there that you think would be—would affect your ability to be a fair and impartial juror in this case?" RP (Apr. 30, 2012) at 11. The juror responded, "With that, no." RP (Apr. 30, 2012) at 11. Later, she explicitly rejected defense counsel's comment suggesting that her encounter with the woman in the van would make it hard for her to "feel neutral about Mr. Monson and the charge." RP (Apr. 30, 2012) at 13. She said, "I don't think it that way . . . . I don't see it that way." RP (Apr. 30, 2012) at 13. She added, "Like, you know, I don't have any judgment that way

because of that so it's—because everyone has its own decision." RP (Apr. 30, 2012) at 13. When defense counsel pressed her on increased fears during trial affecting her fairness, she responded, "I think it will be fair." RP (Apr. 30, 2012) at 14. The court concluded, "[Her] answers satisfied me that she believes that she can decide this case based on the evidence and the law given to her." RP (Apr. 30, 2012) at 97.

Monson argues, "[W]hile the juror said she thought she could be fair, her demeanor apparently suggested otherwise." Br. of Appellant at 14. This argument is unpersuasive because we defer to the trial court's evaluation of the juror's demeanor and credibility.[3] See Rafay, 168 Wn. App. at 822 (when the trial court has assessed alleged juror misconduct for purposes of RCW 2.36.110 and CrR 6.5, the reviewing court defers to the lower court's credibility determinations); Jorden, 103 Wn. App. at 226 (when assessing an allegation of juror inattentiveness under RCW 2.36.110 and CrR 6.5, the trial court had "'fact-finding discretion'") (quoting Ottis v. Stevenson-Carson Sch. Dist. No. 303, 61 Wn. App. 747, 753, 812 P.2d 133 (1991)); see also Elmore, 155 Wn.2d at 769 n.3 (trial court is in the best position to evaluate jurors' candor and ability to deliberate); Hough, 152 Wn. App. at 341 ("We defer to the judge's factual determinations.").

Monson also claims "the prosecutor acknowledged [that] if the juror was affected by her fear of Monson, she might be more likely to convict." Br. of Appellant at 14.

---

[3] At oral argument, Monson's appellate counsel observed that the trial court made no express finding regarding the juror's demeanor. No controlling authority requires such a finding. To the contrary, while "[t]he test is whether the record establishes that the juror engaged in misconduct," there is no "mandatory format for establishing such a record." Jorden, 103 Wn. App. at 229. Where, as here, the trial court directly questions the challenged juror and then observes the juror during questioning by defense counsel, the court's demeanor observations inhere in its ruling.

Monson implies the State acknowledged at trial the juror's bias. Nothing in the record supports this assertion. The prosecutor argued below, "If [the juror] were going to be affected by her fear, it can be either—she would be less likely [to convict] because she's afraid of the defendant or she would be more likely to convict for that reason, so I think it's a wash." RP (Apr. 30, 2012) at 16. The State has not conceded bias.

Finally, Monson relies on United States v. Thompson, 744 F.2d 1065 (4th Cir. 1984). In Thompson, the United States charged codefendants with murdering their child by starvation and gross neglect. At trial, the government displayed a photograph of the dead child. One of the jurors said the photograph "upset him." Thompson, 744 F.2d at 1067. He told the trial court, "I would try to be as much as I could, but I am just not sure I could be totally fair." Thompson, 744 F.2d at 1067. The court denied a mistrial motion but admonished the juror to keep an open mind. The juror responded, "'I will try. I am not sure, your Honor.'" Thompson, 744 F.2d at 1068. In a split decision, the Court of Appeals reversed the defendants' convictions. The majority wrote, "We are convinced that this is a case in which the trial court abused its discretion in proceeding with the trial after [the juror] gave an equivocal response to repeated questions about his ability to proceed with an open mind." Thompson, 744 F.2d at 1068. Thompson does not control. Unlike the juror in Thompson, the record here shows the juror gave unequivocal and repeated assurances about her continued fairness and impartiality.

We conclude the trial court acted well within its discretion by denying Monson's motion to excuse the juror premised on bias.

## STATEMENT OF ADDITIONAL GROUNDS (SAG)

In his SAG, Monson argues that the trial court improperly played a recording of a police interview given by one of the State's witnesses. He also challenges the jury's verdict, arguing that the jury disregarded exculpatory evidence. Both challenges fail.

### Recorded Police Interview

During a police interview conducted two days after the murder, Cristina D'Angelo stated under penalty of perjury that Monson told her he shot Jones. At trial, D'Angelo testified that she had little or no memory of the interview and the events surrounding the murder because she was strongly under the influence of drugs at the time. When asked if she made specific statements during the interview, she repeatedly answered, "I don't remember." She claimed she was suffering from "meth-induced psychosis," and that she remembered only "bits and pieces" of the days preceding the interview. RP (May 2, 2012) at 196. During cross-examination, defense counsel asked D'Angelo whether she presently believed that Monson shot Jones. She said she did not.

Over Monson's objection, the trial court subsequently played an audio recording of the interview. The court rejected defense counsel's argument that the State failed to show D'Angelo was "competent" and "coherent" during the interview. RP (May 3, 2012) at 36. It reasoned that counsel's concerns addressed the weight, rather than the admissibility, of the evidence. Monson now argues that the trial court "denied a fair trial by allowing D'Angelo's statement to be played/read to the jury." SAG at 1. He explains,

-9-

"[D'Angelo's] mental acuity was in question[;] she was not in her right mind [at the] time of [the] statement [and] denied signing it or telling the truth."[4] SAG at 1.

"Decisions involving evidentiary issues lie largely within the sound discretion of the trial court and will not be reversed on appeal absent a showing of abuse of discretion." State v. Castellanos, 132 Wn.2d 94, 97, 935 P.2d 1353 (1997). "A recorded statement given to police is inadmissible hearsay unless it qualifies for an exception to the hearsay rule." State v. Nava, 177 Wn. App. 272, 290, 311 P.3d 83, 92 (2013). Under ER 803(a)(5),[5] the trial court properly admits an audio recording when the proponent demonstrates that:

> (1) the record pertains to a matter about which the witness once had knowledge; (2) the witness has an insufficient recollection of the matter to provide truthful and accurate trial testimony; (3) the record was made or adopted by the witness when the matter was fresh in the witness's memory; and (4) the record reflects the witness's prior knowledge accurately.

State v. White, 152 Wn. App. 173, 183, 215 P.3d 251 (2009). The fourth requirement "may be satisfied without the witness' direct averment of accuracy at trial." State v. Alvarado, 89 Wn. App. 543, 551, 949 P.2d 831 (1998). "The court must examine the totality of the circumstances, including (1) whether the witness disavows accuracy; (2) whether the witness averred accuracy at the time of making the statement;

---

[4] Monson does not specify precisely which "statement" he believes the court admitted improperly. SAG at 1. He also cites no legal authority supporting his claim.

[5] ER 803(a)(5) excepts from the hearsay rule "[a] memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness' memory and to reflect that knowledge correctly." The trial court did not expressly admit the recording under ER 803(a)(5). We may, however, affirm on any basis supported by the record. State v. Torres, 151 Wn. App. 378, 389, 212 P.3d 573 (2009).

(3) whether the recording process is reliable; and (4) whether other indicia of reliability establish the trustworthiness of the statement." Alvarado, 89 Wn. App. at 551-52.

Monson appears to argue that D'Angelo was so intoxicated during the interview that her recorded statements do not concern "a matter about which [she] once had knowledge . . . ."[6] ER 803(a)(5). This argument is unpersuasive. The police interviewed D'Angelo just two days after Jones was murdered. At trial, Detective Larry Cole testified that D'Angelo was "coherent and cooperative," that she understood the situation, and that her "answers seemed appropriate for the questions." RP (May 3, 2012) at 12, 34. He said she "would mumble sometimes," but he had no concerns about her "mental acuity." RP (May 3, 2012) at 12. He summarized:

> I would describe it as she was—she was dope sick. She was coming down off her high; she had like flulike symptoms. But she was coherent. She kn[e]w who she was, knew who we were, knew where she was, and she definitely knew the topic we were about to talk about.

RP (May 3, 2012) at 14. Following the interview, D'Angelo signed a form indicating that her answers were truthful, voluntary, and given under penalty of perjury. Although D'Angelo testified at trial that she no longer believed Monson shot Jones, we have held that a witness does not disavow the accuracy of a recorded recollection merely by giving contradictory testimony at trial. White, 152 Wn. App. at 185-86. Finally, Monson does not challenge the accuracy of the recording itself. On this record, the trial court properly exercised its discretion when it played the recording for the jury.

---

[6] As phrased, Monson's argument appears to challenge the first, third, or fourth requirements of the White test quoted above.

Sufficiency of the Evidence

Monson also challenges the jury's verdict, arguing that the jury failed to consider evidence that (1) DNA (deoxyribonucleic acid) found on the murder weapon matched more than one profile; (2) police found no blood spatter or gun powder on his clothing; and (3) "there were two persons besides the victim in the immediate area of the murder, yet neither one of them sa[w] the actual shooting or shooter." SAG at 3. Because Monson concludes "there was reasonable doubt established," we will treat his claim as a challenge to the sufficiency of the evidence supporting his first degree murder conviction. SAG at 3.

Evidence is sufficient if, "'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Green, 94 Wn.2d 216, 221, 616 P.2d 628 (1980) (quoting Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979)). Monson asks us to reweigh the evidence. We do not reweigh the evidence. State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004) (for purposes of sufficiency challenge, appellate courts "must defer the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence.").

## CONCLUSION

We affirm Monson's convictions for first degree premeditated murder and second degree unlawful possession of a firearm.

WE CONCUR:

-12-