IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 37923-0-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DAVID M. CAMPBELL, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, C.J. — David Campbell appeals his convictions for second degree

murder and possession of methamphetamine. He contends the trial court committed

evidentiary error by admitting (1) as a recorded recollection, statements attributed to a

witness in a report prepared by a detective, and (2) another officer's testimony that a

hysterical witness at the scene of the murder accused Mr. Campbell. He contends his

conviction for simple possession must be reversed and dismissed following our Supreme

Court's decision in *State v. Blake*, 197 Wn.2d 170, 481 P.3d 521 (2021), and he should be

resentenced based on a corrected offender score.

The trial court erred in admitting the detective's testimony about what he was told by a witness, where the witness had not adopted the detective's record of her statements and there was insufficient evidence that his record accurately reflected her knowledge. We find the error harmless, however.

Mr. Campbell's challenge to a witness's excited utterance on confrontation grounds was waived when that objection was not raised in the trial court.

Mr. Campbell's challenge to his simple possession conviction and his request for resentencing are well-taken, as the State concedes.

We reverse Mr. Campbell's conviction for possession of a controlled substance and dismiss the charge, affirm his conviction for second degree murder, and remand for resentencing.

FACTS AND PROCEDURAL BACKGROUND

On a late morning in early November 2017, Theresa Raddas discovered her roommate, Jamie Bradshaw, lying face-down on the front porch of their home, bleeding badly and not breathing. Ms. Raddas screamed for help from her son, who helped her place a call to 911 that was received at 11:02 a.m. Police and paramedics arrived moments later and began administering emergency first aid, but to no avail. Ms. Bradshaw was pronounced dead by the paramedics at 11:29 a.m. She was later

determined to have died from at least 16 stab wounds.  No one had heard or seen the attack on Ms. Bradshaw.

Spokane County Sheriff's Detective Lyle Johnston was assigned to lead the investigation and interviewed Ms. Raddas at the crime scene.  He audio recorded the interview and later used the recording to prepare a written report.  Ms. Raddas told the detective that David Campbell, Ms. Bradshaw's ex-boyfriend, had come by to see Ms. Bradshaw that morning and Ms. Bradshaw went outside to speak with him.  Ms. Raddas assumed the two left together and later returned when she noticed on the live feed from her surveillance system that Mr. Campbell's car was pulling out of her driveway.

Responding officers observed a blood trail that started at cars parked in the driveway and led up to the front steps to Ms. Bradshaw's body.  Ms. Bradshaw's cellphone was found on the ground behind a parked car in the driveway.

Mr. Campbell was arrested that day at around 4:00 p.m. at a Union Gospel Mission men's shelter, where he sometimes stayed.  Police seized his car, which was parked nearby.  Following his arrest, Mr. Campbell was taken to the sheriff's office and was questioned in a conference room that was wired to record video and audio.  At one point when Mr. Campbell was alone in the room, a sergeant monitoring the video feed noticed Mr. Campbell rubbing his shoes together and on the carpet, in what appeared to

be an effort to rub something off his shoes. His shoes and other clothing were collected by law enforcement.

The State eventually charged Mr. Campbell with second degree murder domestic violence, and with possession of a controlled substance after methamphetamine was discovered in a search of his car.

*Investigative work*

Officers obtained a warrant to search Mr. Campbell's car the day after the murder. In addition to locating methamphetamine-containing glass pipes, they located a ceramic knife sharpener in the car, but no knife. Many areas of the car were tested for the presence of blood, but the several pieces of evidence from the car that were provided to the crime lab for testing did not reveal the presence of Ms. Bradshaw's DNA (deoxyribonucleic acid).

Officers obtained records that helped create a timeline. Derrick Miller, who had dated Ms. Bradshaw in the past, had been in regular contact with her by text message, and the last text he received from her was one wishing him good morning at 10:10 a.m. on the morning she was killed.

Two friends of Ms. Bradshaw had agreed to repair a damaged tire from her car a couple of days before her death, and on the morning of the murder, at 10:14 a.m., one of them—Richard Johnson—texted Ms. Bradshaw, "Hello my dear your tire is done."

Ex. P 134. Ms. Bradshaw responded to Mr. Johnson at 10:15 a.m., "Ok I'll come get it."

*Id.*

Surveillance from the Union Gospel Mission showed Mr. Campbell entering the facility at 2:36 p.m., using the bathroom, and leaving a couple of minutes later. Throughout, he appeared to be wearing white shoes, jeans, and a beret. Yet when Mr. Campbell was arrested at 4:00 p.m., he was wearing different clothing, including a newsboy hat and sweatpants, although his shoes appeared the same.

Among materials submitted for DNA testing was Mr. Campbell's right shoe, which was tested for possible blood stains. The DNA results showed the stain was blood from two people, one being Ms. Bradshaw.

No murder weapon was ever found, nor was the clothing that Mr. Campbell had been wearing as described by Ms. Raddas and observed in the Union Gospel Mission video.

*Trial*

The trial took place almost three years after the murder. The State called over a dozen witnesses, including witnesses able to testify to the fruits of the police investigation identified above. We touch on only the testimony relevant to the issues on appeal.

Deputy Glenn Hinckley of the Spokane Valley Police Department was one of the first officers to respond to the 911 dispatch and on arrival, he began recording the scene using his cell phone. When the prosecutor asked the deputy if he heard anyone speaking while Ms. Bradshaw was being attended to, he gave a partial answer before being met with a defense objection.

The prosecutor reminded the court that when asked what was happening on his arrival at the scene, Deputy Hinckley had answered, "Just commotion." Report of Proceedings (RP) at 307. The prosecutor said he would offer what the deputy heard as an excited utterance. The trial court responded it would need some foundation.

The prosecutor questioned Deputy Hinckley further and offered the deputy's cellphone video, which was played for the jury. When the prosecutor questioned the deputy about a voice that could be heard "in the background . . . apart from the emergency personnel," Deputy Hinckley answered that it was a voice of a female he could not identify, adding, "I just remember hearing her." RP at 315. Defense counsel again objected, without stating a basis for the objection. The court sustained the objection as to foundation, and the prosecutor continued his questioning:

> Q    (By [the prosecutor:]) How did that voice on the recording sound to you in terms of the emotional status of the person speaking?
>
> A    She was hysterical.
>
> Q    Is that the tone of voice that you heard from that particular female at the scene the whole time you were there?

6

A     Yes.

Q     During the time that the person was in that state of mind or in that state of emotion, did she say anything about a suspect in the case?

A     She named a—

[DEFENSE COUNSEL]:  Your Honor, I would maintain my objection.

THE COURT:  I'm going to overrule it if you can answer it the way it's asked.

THE WITNESS:  She named it.

Q     (By [the prosecutor]):  What name did she give?

A     I have to look at my report.

. . . .

[PROSECUTOR:]  With the Court's permission, you can take a look at your report for that information.

THE COURT:  Do you have it with you?

THE WITNESS:  Yep.

THE COURT:  Yes, you may.

THE WITNESS:  David Campbell.

RP at 316-17.

The State then called Ms. Raddas to testify.  She testified that on the morning of the murder she awoke early and left with her boyfriend at around 6:30 a.m. to take him to work.  She observed Ms. Bradshaw asleep on a couch in the living room.  After her return, Ms. Bradshaw awoke by 9:00 a.m. and the two women shared a coffee as the two other residents of the home—Ms. Raddas's 20-year-old son, Luke, and his girlfriend— still slept.

Ms. Raddas testified that at some point that morning, David Campbell arrived at the home. While Mr. Campbell's and Ms. Bradshaw's relationship was over, the two had a son who was then in court-ordered foster care, and the couple had been in contact because of him. Ms. Raddas answered the door and invited Mr. Campbell in, but he declined, which was atypical, saying he "had to talk to Jamie." RP at 330.

Ms. Raddas could not recall what time Mr. Campbell arrived. She described him as appearing distraught. She assumed that after Ms. Bradshaw went outside to see Mr. Campbell the two of them left together, although she did not see them leave at that time.

Ms. Raddas intended to do some shopping that morning, so she went to her room to get ready. Sometime later, she noticed on the live-feed from her surveillance system that Mr. Campbell's car was making a U-turn and he was driving away.[1] She assumed that maybe he and Ms. Bradshaw had gone somewhere, had returned, and he was now leaving. She testified she had "no idea" how much time passed between when Ms. Bradshaw went outside with Mr. Campbell and when she saw Mr. Campbell make the U-turn, but it might have been less than an hour. She testified her best recollection of how much time she spent getting ready to leave that morning was "probably about an hour." RP at 336.

---

[1] The system did not create a recording.

It was on her way out the door to go shopping that Ms. Raddas discovered Ms. Bradshaw's body.

After questioning Ms. Raddas about what she could recall, the prosecutor asked whether she might have had a more specific recollection on the day Ms. Bradshaw was killed, that she shared with the police:

Q    Now, Ms. Raddas, I want to jump ahead in time just a little bit.  Was there a time that day on November 7th that you talked to the police about what happened that day?

A    I believe so, yes.

Q    And when you talked to the police, were some of these timeframes that we're talking about maybe a little more fresh in your head?

A    Yes.

Q    When you talked to the police, do you remember if you talked about timeframes?

A    I don't remember.

Q    Do you know if they asked you about timeframes at all?

A    I don't know.

Q    When the police were talking to you, did you do your best to tell them the truth?

A    Yes.

Q    Did you make efforts to be accurate like you were saying to them?

A    Yes.

Q    Do you think that anything you would have said to them back then would maybe be in terms of your memory a little more reliable than now?

A    Yes.

RP at 335-36.

9

Richard Johnson and Eric Parker, the friends of Ms. Bradshaw who had repaired her tire in the days before her murder, testified that Mr. Campbell had driven her to their home in Post Falls, Idaho, to drop it off two days earlier. Mr. Parker testified that Ms. Bradshaw was uncharacteristically "quiet and standoffish" that day, and that Mr. Campbell was also "very cold." RP at 406-07.

At the outset of proceedings on the last day of the State's case, the prosecutor informed the trial court that he intended to recall Detective Johnston that afternoon and question him about several statements Ms. Raddas made when he interviewed her on the day of the murder. A couple addressed details about the timeline. Another addressed Mr. Campbell's appearance. The prosecutor identified the statements by reading from Detective Johnston's report:

> "That around 10:00 A.M. when Campbell arrived at the house to see Bradshaw, Raddas thought it had only been a half hour between Campbell arriving to talk to Bradshaw and finding Bradshaw laying on the porch. Then later Raddas was in her bedroom talking on her phone when she saw Campbell's car in the surveillance system, which allowed her to watch Campbell's car to do a U-turn in the street in front of her house. Raddas believed it was about ten minutes between the time she saw Campbell's car do the U-turn and the time she discovered Bradshaw laying on the porch."
>
> . . . .
>
> "Raddas described Campbell as wearing a gray sweatshirt and blue jeans at the time she saw him. She knew he had short hair."

RP at 557-58. The prosecutor told the court he would offer the statements as recorded recollection under ER 803(a)(5).

10

Defense counsel made his objection to the evidence that afternoon. He argued that collectively, the testimony of Ms. Raddas and Detective Johnston did not establish part of the required foundation for a recorded recollection: it did not establish that the record from which the detective testified was adopted by Ms. Raddas when the matter was fresh in her memory, or that it accurately reflected her prior knowledge. The prosecutor responded that Professor Karl Tegland's analysis of ER 803(a)(5) in the *Washington Practice* series identified cases where the witness whose recollection was at issue "refused to testify . . . [s]o there's no requirement for us to bring the witness up or confront her with the statements or anything like that." RP at 647.

The court overruled the defense objection, and Detective Johnston testified that Ms. Raddas told him a half hour had passed between when Mr. Campbell arrived to talk with Ms. Bradshaw and when she found Ms. Bradshaw lying on the front porch. He testified that Ms. Raddas told him she believed 10 minutes passed from when she saw Mr. Campbell's car do a U-turn and the time she discovered Ms. Bradshaw lying on the front porch. He testified to Ms. Raddas's description of Mr. Campbell's appearance.

Mr. Campbell was found guilty as charged. He appeals.

11

No. 37923-0-III
*State v. Campbell*

ANALYSIS

I.    EVIDENTIARY ISSUES

Mr. Campbell's first assignment of error on appeal is to evidentiary rulings by the trial court: he contends that (A) the trial court erred in admitting Detective Johnston's report of statements made by Ms. Raddas as recorded recollection under ER 803(a)(5), and (B) the court's admission of Deputy Hinckley's testimony to an excited utterance accusing him of the murder violated his constitutional confrontation rights.

A.    *The trial court abused its discretion in admitting Detective Johnston's testimony as recorded recollection, but the error is harmless*

ER 803(a)(5) provides an exception to the hearsay rule for recorded recollection, whether or not the declarant is available.  It states:

> A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness' memory and to reflect that knowledge correctly.  If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

ER 803(a)(5).

Courts evaluating a record for admission under ER 803(a)(5) have gleaned four elements of a foundation from the rule.  "Admission is proper when the proponent of the evidence demonstrates that (1) the record pertains to a matter about which the witness once had knowledge, (2) the witness has an insufficient recollection of the matter to

12

provide truthful and accurate trial testimony, (3) the record was made or adopted by the witness when the matter was fresh in the witness's memory, and (4) the record reflects the witness's prior knowledge accurately." *State v. Nava*, 177 Wn. App. 272, 290, 311 P.3d 83 (2013) (citing *State v. Mathes*, 47 Wn. App. 863, 867, 737 P.2d 700 (1987)).

Mr. Campbell contends that neither the third nor fourth elements were demonstrated here. The State argues that they were, and if not, the admission of the evidence was harmless.

We review the admission of statements under ER 803(a)(5) for an abuse of discretion. *State v. Derouin*, 116 Wn. App. 38, 42, 64 P.3d 35 (2003). If the evidentiary ruling is based on an incomplete analysis of the law or a misapprehension of the legal issues, then an abuse of discretion may have occurred. *Id.* An abuse of discretion occurs when no reasonable person would take the view of the trial court. *State v. White*, 152 Wn. App. 173, 183-84, 215 P.3d 251 (2009). Because both parties analyze the presence of the third element under case law dealing principally with the fourth, we begin with the fourth element.

*Element 4: whether the record reflects the witness's prior knowledge accurately*

As was observed in *State v. Alvarado*, 89 Wn. App. 543, 550-51, 949 P.2d 831 (1998), the "normal," "ideal," means of demonstrating the fourth element required for a recorded recollection is to have the witness who made the statement testify that despite a

13

present lack of memory, he or she recalls making the statement, and it was accurate when made. *Id.* at 549-50. The State understandably did not elicit such testimony from Ms. Raddas, since she did not make the record being offered.

The State responds by pointing out that Washington courts "have adopted the minority view that 'the requirements that a recorded recollection accurately reflect the witness' knowledge may be satisfied without the witness' direct averment of accuracy at trial.'" Br. of Resp't at 28 (quoting *Alvarado*, 89 Wn. App. at 551) (citing *Nava*, 177 Wn. App. 273).

In *Alvarado*, the recorded recollection was a taped statement from witness Louis Lopez, made within eight days of a murder. 89 Wn. App. at 549. As the court observed, it was "Lopez's own words and thus [a statement] made and adopted by him," easily satisfying the first three elements. *Id.* At trial, however, Lopez testified that he did not recall the incident at all and could not verify that any statement he had provided to police was true, thus depriving the State of the "ideal" demonstration of the fourth element.

The *Alvarado* court held that "what is ideal in theory may be some distance from what is possible in practice." *Id.* at 550. It concluded that a court can find that a record reflects the witness's knowledge accurately without the witness's direct averment at trial, but to do so, it "must examine the totality of the circumstances, including (1) whether the witness disavows accuracy; (2) whether the witness averred accuracy at the time of

14

making the statement; (3) whether the recording process is reliable; and (4) whether other indicia of reliability establish the trustworthiness of the statement." *Id.* at 551-52.

What proved important in *Alvarado* was that Lopez never recanted or disavowed the accuracy of two statements offered by the State, he affirmatively asserted their accuracy at the time he made them (he asserted in the last of his statements that all the information he had related was true, *id.* at 546), and "[t]here was no suggestion that the tapes do not accurately reflect his statements." *Id.* at 552. The statements were admitted and on appeal, an ineffective assistance of counsel challenge was rejected on the basis that the two statements were properly admitted as recorded recollections. *Id.* at 553.

In *Nava*, witnesses had disavowed their recorded statements, but there were reasons for disbelieving their disavowals. 177 Wn. App. at 297. Circumstances supporting the accuracy of the statements were that they were tape-recorded interviews of the witnesses, most were audible and clear, and each recorded statement was acknowledged by the witness at trial to be a record of his or her questioning by detectives. *Id.* at 296. Each of the witnesses had audibly vouched for the truth of their statement in the recording, and also audibly agreed when recorded that no force was used or threat or promise made to induce them to provide the statement. *Id.* The statements were admitted in the trial court, whose ruling was affirmed on appeal. *Id.* at 296-98.

15

As Mr. Campbell argues, the gap in the State's demonstration in this case is that the State was not offering the audio recording of Ms. Raddas's interview, but, instead, Detective Johnston's testimony about his narrative report. As argued by Mr. Campbell at trial, the detective's report did not even place Ms. Raddas's alleged statements in quotation marks. There is no indication that Ms. Raddas was asked to affirm to the detective at the time of the interview that everything she had told him was accurate.

We hold that the State's demonstration of the fourth element of the foundation was insufficient, but we need not find error on that basis alone because the third required element was also not demonstrated

*Element 3: whether the record was made or adopted by the witness when the matter was fresh in the witness's memory*

Mr. Campbell also argues that the record being offered was not made or adopted by Ms. Raddas when fresh in her memory.

Lacking any other Washington authority on point, Mr. Campbell points to *Derouin*'s citation to some dictum in a Vermont decision, *State v. Marcy*, 165 Vt. 89, 680 A.2d 76 (1996). We agree that the dictum in *Marcy* is instructive. The Vermont court pointed out that some cases have mischaracterized a third element "failure to adopt" problem as a fourth element "failure to affirm accuracy" problem. *Derouin*, 116 Wn. App. at 45 n.1. As the Vermont court explains, such cases arise when the recorded recollection being offered was not made by the prescient witness, but by someone else,

16

usually a law enforcement agent. As explained in *Marcy*, these cases present a problem with the third element, because if the recorded recollection was not "made" by the prescient witness, it must at least be "adopted" by her or him. As pointed out by the Vermont decision, "Understandably, where a prior statement was prepared by a person other than the witness, *courts have relied on or even required evidence that the witness had sworn or otherwise affirmed the accuracy of the prepared statement*, to satisfy the requirement that the witness adopted the statement." 680 A.2d at 79 (emphasis added). And, of course, the third element requires that the adoption occur "when the matter was fresh in the witness's memory." The State presented no evidence that Ms. Raddas adopted Detective Johnston's report at a time when the matter was fresh in her memory.

The State never responds to this point.[2] Because the State never demonstrated Ms. Raddas's timely adoption of the recorded recollection it sought to offer and the totality of the circumstances do not demonstrate that the detective's report accurately reflects Ms. Raddas's knowledge, the trial court abused its discretion in admitting the testimony.

*Harmless error*

Nevertheless, we agree with the State that the error was harmless. A nonconstitutional evidentiary error requires reversal only if the error, within reasonable

---

[2] It points out that *Derouin* did not adopt *Marcy*, (it had merely been referred to by the trial court) and that *Derouin* is distinguishable from this case. It then appears to extend the "totality of the circumstances" reliability analysis we apply to the fourth element to the third element as well. Br. of Resp't at 31-35.

probability, materially affected the outcome of trial. *State v. Halstien*, 122 Wn.2d 109, 127, 857 P.2d 270 (1993). Ms. Raddas estimated at trial that she took an hour to get ready. This hour-long time period began soon after Mr. Campbell arrived at the home and ended within minutes before 911 received her 11:02 a.m. call. Within that hour, she observed Mr. Campbell drive away from the property. Ms. Bradshaw sent her last text message to Mr. Johnson at 10:15 a.m. Collectively, this evidence established an only-slightly longer window of time for the murder than the information Detective Johnston testified was reported during his interview of Ms. Raddas.

As for Deputy Johnston's testimony about Ms. Raddas's description of Mr. Campbell's clothing, the State points out that the same evidence could have been admitted as a statement of identification and thereby nonhearsay under ER 801(d), a basis it offered as an alternative at trial. We may affirm on any basis supported by the record. *State v. Poston*, 138 Wn. App. 898, 905, 158 P.3d 1286 (2007). And this evidence, too, was cumulative of other evidence that Mr. Campbell was wearing jeans and other attire at the time of his 2:36 p.m. stop at the Union Gospel Mission that was different from what he was wearing when arrested an hour and a half later.

We also agree with the State that, as evidence, Ms. Raddas's statements recounted by Detective Johnston pale in comparison to other evidence presented by the State. As summarized by the State, the following were key: the blood on Mr. Campbell's shoes,

and his effort in police custody to wipe it off; his "distraught" appearance shortly before the murder; that Mr. Campbell had provided Ms. Bradshaw's transportation to Post Falls to drop off her tire and came by on the morning she said she would pick it up; that Mr. Campbell texted with Ms. Bradshaw frequently but ceased doing so after the time of her murder, supporting an inference that he knew she was dead; Ms. Raddas's testimony that no other person or vehicle arrived at her home between the time Ms. Bradshaw went outside to speak with Mr. Campbell and the discovery of her body; and the location of the blood trail and Ms. Raddas's observation of Mr. Campbell's vehicle's departure. Br. of Resp't at 38-39. The erroneous admission of Detective Johnston's testimony was not reversible error.

B.     *Mr. Campbell's right to confrontation was waived*

Mr. Campbell's remaining evidentiary challenge is to the admission of Deputy Hinckley's testimony that an unidentified, hysterical female speaker at the crime scene accused Mr. Campbell of the murder. For the first time on appeal, he challenges the testimony as a violation of his right to confrontation under the federal and state constitutions. Where a witness is absent but the State wishes to present his or her prior testimonial statements at trial, it can do so consistent with the federal and state constitutions only if the witness is truly unavailable and the defendant has had a prior opportunity for cross-examination. *State v. Price*, 158 Wn.2d 630, 639, 146 P.3d 1183

19

(2006) (citing *Crawford v. Washington*, 541 U.S. 36, 59, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004); U.S. CONST. amend VI; WASH. CONST. art. I, § 22.

In *State v. Burns*, 193 Wn.2d 190, 210-11, 438 P.3d 1183 (2019), the Washington Supreme Court adopted a requirement that a defendant object in the trial court to evidence that violates his right to confrontation, failing which the right is waived. It thereby aligned confrontation clause error with case law holding that other constitutional rights may be waived by a failure to object. *Id.* at 211. It observed that requiring an objection is in the interests of judicial efficiency and clarity, and provides a basis for appellate courts to review a trial judge's decision. After *Burns*, if a defendant does not object at trial, "'nothing the trial court does or fails to do is a denial of the right, and if there is no denial of a right, there is no error by the trial court, manifest or otherwise, that an appellate court can review.'" *Id.* (quoting *State v. Fraser*, 170 Wn. App. 13, 25-26, 282 P.3d 152 (2012)).

Since Mr. Campbell's confrontation right was waived, there is no error to review.[3]

---

[3] Following the filing of the State's response brief, Mr. Campbell moved this court for leave to file a supplemental brief assigning error to ineffective assistance of counsel for failure to object at trial on confrontation grounds. The State opposed the motion, pointing out that if we entertained the supplemental argument, it wanted to supplement the record with evidence that would demonstrate that defense counsel had tactical reasons not to raise a confrontation objection.

We denied the motion to file a supplemental brief. Mr. Campbell remains free to file a personal restraint petition alleging ineffective assistance of counsel.

No. 37923-0-III
*State v. Campbell*

III.     FOLLOWING *BLAKE*, MR. CAMPBELL'S CONVICTION FOR SIMPLE POSSESSION MUST
         BE REVERSED AND HE IS ENTITLED TO RESENTENCING

In *Blake*, the Washington Supreme Court declared unconstitutional the statute

criminalizing simple possession of a controlled substance (former RCW 69.50.4013

(2017)) because it criminalized innocent and passive possession.  197 Wn.2d at 183.  As

the State concedes, reversal of his conviction for possession is required and, given the

change in his offender score, he is entitled to be resentenced.

We reverse Mr. Campbell's conviction for possession of a controlled substance

and dismiss the charge with prejudice, affirm his conviction for second degree murder,

and remand for resentencing.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Siddoway, C.J.

WE CONCUR:

_____        _____
Lawrence-Berrey, J.                             Pennell, J.